IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE: SHORENSTEIN HAYS-NEDERLANDER THEATRES LLC APPEALS | § § § § § § § § § § § § | Nos. 596, 2018 and 620, 2018<br><br>CONSOLIDATED<br><br>Court Below:<br>Court of Chancery<br>of the State of Delaware<br><br>C.A. Nos. 9380-VCMR and<br>2018-0701-TMR |

Submitted: May 8, 2019
Decided: June 20, 2019

Before **VALIHURA**, **SEITZ**, and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

Tammy L. Mercer, Esquire, Jack B. Jacobs, Esquire, Martin S. Lessner, Esquire, and M. Paige Valeski, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Of Counsel: Matthew L. Larrabee, Esquire (*argued*), Benjamin M. Rose, Esquire, Dechert LLP, New York, New York; Michael S. Doluisio, Esquire, Dechert LLP, Philadelphia, Pennsylvania for Appellant/Cross-Appellee *Nederlander of San Francisco Associates*.

Raymond J. DiCamillo, Esquire, Susan M. Hannigan, Esquire, and Sarah T. Andrade, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: David B. Tulchin, Esquire (*argued*), Brian T. Frawley, Esquire, and Andrew J. Finn, Esquire, Sullivan & Cromwell LLP, New York, New York for Appellees/Cross-Appellants *CSH Theatres LLC, CSH Curran LLC, CSH Productions, Curran Live, LLC, Carole Shorenstein Hays, Dr. Jeffrey Hays and Thomas Hart.*

**VALIHURA**, Justice:

This is a consolidated appeal of two separate actions, both of which arise from a dispute involving a theater partnership.[1]  Robert E. Nederlander, Sr. ("Robert")[2] controls Nederlander of San Francisco Associates ("Nederlander"), a California general partnership.  Carole Shorenstein Hays ("Carole") and her family control CSH Theatres L.L.C. ("CSH"), a Delaware LLC.[3]  Nederlander and CSH each own a fifty-percent membership interest in Shorenstein Hays-Nederlander Theatres LLC ("SHN"), a Delaware LLC that operates theaters in San Francisco under SHN's Plan of Conversion and Operating Agreement of the Company (the "LLC Agreement").

In 2010, CSH Curran LLC ("CSH Curran"), an entity that Carole co-manages,[4] purchased the Curran Theatre in San Francisco (the "Curran").  SHN had been operating under a lease from the Curran's then-owners, the Lurie Company ("Lurie"), since the beginning of the partnership.  Carole and her husband, Dr. Jeffrey Hays ("Jeff") (collectively, the "Hayses"), did not extend that lease with SHN when it expired in 2014.

---

[1] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, Consol. Nos. 596, 2018 and 620, 2018 (Del. Jan. 9, 2019) (ORDER) (consolidating the separate appeals from C.A. No. 9380 and C.A. No. 2018-0701).

[2] To avoid confusion, this Opinion refers to certain individuals by their first names.  We intend no disrespect or familiarity.

[3] The Shorenstein-Hays family controls CSH through CJS Trust-A, which is one of two trusts relevant to this dispute that Carole's father, and the patriarch of the Shorenstein family, Walter Shorenstein, set up for Carole's benefit.  The other trust is CSH Doule Trust.  Carole, her husband, their two children, and Thomas Hart manage those trusts.

[4] Carole purchased the Curran indirectly through CSH Doule Trust.  CSH Doule Trust owns CSH Curran LLC, which Carole and Hart manage through CSH Doule LLC, the sole member of CSH Curran.

Thereafter, the Hayses began staging productions at the Curran. In February 2014, CSH sued Nederlander in the Court of Chancery for a declaratory judgment that it had no legal obligation to renew the Curran lease (the "Declaratory Judgment Action").[5] Nederlander asserted counterclaims against CSH and third-party claims against the Hayses for breaches of their fiduciary and contractual obligations, among other claims.[6] The court held in a thorough July 31, 2018 opinion that there was no enforceable promise to renew the lease of the Curran to SHN, that CSH did not breach the LLC Agreement, and that the Hayses breached their common law fiduciary duties of loyalty (the "Declaratory Judgment Opinion").[7]

In September 2018, Nederlander sought a preliminary injunction in the Court of Chancery against CSH and the Hayes to prevent them from staging *Dear Evan Hansen* and *Harry Potter and the Cursed Child* ("*Harry Potter*") at the Curran (the "PI Action"). In the PI Action, Nederlander asserted four counts, but focused its injunction efforts on Count I, which asserted breach of contract claims (based upon the "provisions of Section 7.02 of the LLC Agreement or the contractual fiduciary duties owed to SHN and its members under

---

[5] The demand for a declaratory judgment pursuant to 10 *Del. C.* § 6501 was the sole count in CSH's complaint. *See* App. to Opening Br. at A364–68 (CSH Complaint).

[6] Nederlander's counterclaims and third party claims included counts of breach of fiduciary duty against the Hayses (Count I), breach of the LLC Agreement against CSH (Count II), fraudulent inducement against CSH and Carole (Count III), breach of contract against CSH and Carole (Count IV), promissory estoppel against CSH, CSH Curran LLC, and the Hayses (Count V), and declaratory judgment with respect to the LLC Agreement pursuant to 10 *Del. C.* § 6501 (Count VI). *Id.* at A422–27 (Nederlander Counterclaims and Third Party Complaint).

[7] *CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at *37 (Del. Ch. July 31, 2018) [hereinafter *Declaratory Judgment Opinion*].

the LLC Agreement")[8] against all defendants in that action.[9] The trial court denied that motion in a November 30, 2018 opinion (the "PI Decision").[10] On December 21, 2018, the trial court entered a partial final judgment as to Count I of Nederlander's Complaint, pursuant to Court of Chancery Rule 54(b), to allow for an immediate appeal of the PI Decision.

Nederlander argues on appeal that the trial court erred in the Declaratory Judgment Action by refusing to enforce Section 7.02(a) of the LLC Agreement against the Hayses. Specifically, Nederlander contends that the Hayses engaged in competitive conduct at the Curran that violated their contractual duty under Section 7.02(a) to maximize SHN's economic success. Alternatively, Nederlander argues that the trial court erred in the PI Decision by holding that the Hayses did not "control" *Dear Evan Hansen* and *Harry Potter*, and that the Hayses violated Section 7.02(b) of the LLC Agreement as a result. On cross-appeal, CSH contends that Nederlander's arguments are irrelevant because the trial court incorrectly held in the Declaratory Judgment Action that CSH's Affiliates, including the Hayses, are bound by Section 7.02.

---

[8] App. to CSH Answering Br. at B494 (Mot. for Preliminary Injunction).

[9] The defendants included CSH, CSH Curran LLC, Curran Live, LLC, CSH Productions, LLC, the Hayses, and Thomas Hart. In addition to Count I, Nederlander also alleged a breach of contractual fiduciary duties against CSH (Count II), aiding and abetting a breach of contractual fiduciary duties against all defendants but CSH (Count III), and breach of common law fiduciary duties against CSH, the Hayses, and Thomas Hart (Count IV).

[10] *Nederlander of San Francisco Assocs. v. CSH Theatres LLC*, 2018 WL 6271655, at *11 (Del. Ch. Nov. 30, 2018) [hereinafter *PI Decision*].

4

For the reasons explained below, we agree with Nederlander that the Court of Chancery misinterpreted Section 7.02(a) and that the Hayses cannot stage competitive productions (not falling within Section 7.02(b)'s exceptions) at the Curran that violate its contractual duty to maximize SHN's economic success. Accordingly, we reverse that aspect of the trial court's decision. Because Nederlander has not challenged the court's rulings in the Declaratory Judgment Action as to damages and other forms of relief, we decline to remand that action.[11] Further, in view of our reversal of the trial court's interpretation of Section 7.02(a) in the Declaratory Judgment Action, we order remand of the PI Action for further proceedings consistent with this Opinion. We find no error with any other aspect of the trial court's decisions.

## I.    Background[12]

SHN began in 1977 as Shorenstein-Nederlander Productions of San Francisco, a partnership formed between Walter Shorenstein, Carole's father, and James M. Nederlander, Robert's brother. Since then, SHN has staged productions at several San Francisco theaters. On January 1, 1980, the partnership entered into a ten-year, written lease of the Curran with Lurie.[13] The partners extended the lease in 1989, 1990, and 1997.

---

[11] Nederlander also has not challenged the trial court's finding in the PI Action that Nederlander abandoned its claims that are not within the scope of the partial final judgment.

[12] The Court of Chancery's factual findings are largely unchallenged on appeal, so we rely on them in this Opinion.

[13] A 1978 letter of understanding signed by James Nederlander and Walter Shorenstein states that their "initial purpose [was] solely the operation of the Curran." App. to Opening Br. at A184 (1978 Letter of Understanding).

In 1990, Walter Shorenstein sued Nederlander, claiming that it was "[b]ooking productions to play in competing geographic locations" and "[s]cheduling productions to play in nonpartnership theaters on the most advantageous and profitable dates."[14] The partners settled that litigation and supplemented the partnership agreement in 1992. Out of concern for Nederlander competition with the partnership, that supplement included a new provision in the partnership agreement, Section 4, which provided that:

> Both partners will devote their efforts to maximize the economic success of the Partnership and avoid conflicts of interest. Neither party will stage any production within 100 miles of San Francisco unless (i) it has first played in a Partnership theatre, or (ii) it has been rejected for booking by the other party, or (iii) the Partnership shares in the profits and/or losses of such booking pursuant to an agreement.[15]

This trial court found that this provision was "substantially similar" to Section 7.02 of the LLC Agreement, a key provision on appeal.[16] The trial court stated that limiting competition by the Nederlanders was "'the most important thing' the agreement was meant to do."[17]

---

[14] *Id.* at A250 (First Amended Complaint dated October 29, 1990).

[15] *Declaratory Judgment Opinion*, 2018 WL 3646817, at *3.

[16] *Id.* at *26.

[17] *Id.* (quoting Robert's trial testimony). Testimony from some of the key witnesses in this litigation is consistent with the court's finding that the Shorensteins were concerned about competition from the Nederlanders. Robert testified that "Walter [Shorenstein] was adamant that this be included." App. to Nederlander Reply Br. at AR239, p. 834 (Robert's Oct. 25, 2017 Testimony). Raymond Harris, a Nederlander-appointed director of SHN and Nederlander's Chief Financial Officer, submitted an affidavit stating that "a provision limiting such competition was injected into the LLC Agreement at the request of Mr. Shorenstein due to his concerns that another Nederlander entity might compete by presenting productions within a 100-mile radius of San Francisco." App. to Opening Br. at A649 (Harris Affidavit). Likewise, when Carole was asked as a witness at trial whether she "insist[ed] that a clause be put in the operating agreement to

6

On November 6, 2000, the partnership was converted into a Delaware LLC, and Nederlander and CSH entered into the LLC Agreement as members with a fifty-percent ownership stake each. The LLC Agreement provides for a four-member board of directors, to which both members have the right to appoint two directors. Carole served as co-president of SHN between 2000 and June 2, 2014 (except from January 15, 2013 to March 16, 2013, when she served as SHN's sole president), and as one of the CSH-appointed directors of SHN from 2000 until June 2, 2014. Jeff also served as a CSH-appointed director from 2010 until October 27, 2014. Robert has been a Nederlander-appointed director of SHN since 2000 and its co-president since 2009.[18] Raymond Harris has served as the other Nederlander-appointed director since 2012.

As of 2010, SHN was operating three theaters in San Francisco: the Golden Gate Theatre, the Orpheum Theatre, and the Curran. SHN owned, and still owns, the Golden Gate and Orpheum, but, at that time, it leased the Curran. Producers prefer the Curran for "sit-down" productions—those that play for an extended time, sometimes for multiple years—because it most closely resembles a traditional Broadway theater. In 2009, Lurie had offered to sell the Curran to SHN for $30 million. After negotiations with Robert, Lurie lowered the price to $17.5 million in January 2010. Robert refused to purchase the Curran because he believed the price was still too high. Carole, however, viewed the

---

prevent competition by the Nederlanders," Carole replied, "[w]e were very concerned about it, so yes." App. to Nederlander Reply Br. at AR234, p. 263 (Carole's Oct. 23, 2017 Testimony).

[18] Robert had also served previously as president and CEO of the Nederlander Organization, which owns and operates nine Broadway theaters in New York City and at least fifteen others around the United States, including Broadway San Jose in San Jose, California.

Curran "as a special place" and decided to purchase it herself. The parties agreed that Carole had asked for Robert's permission to purchase the Curran, and that he gave his approval. But the parties disputed whether that approval was contingent on leasing the Curran back to SHN following the expiration of the Lurie lease on December 31, 2014. On December 15, 2010, Carole purchased the Curran through CSH Curran for $16.6 million, which she then rebranded as "SHN Curran Theatre."[19]

After Walter Shorenstein died in 2010, Carole began to feel that Robert was not interested in building a relationship with her. She was also worried about succession plans for SHN, and she "felt maligned, and, indeed, somewhat bullied that [she] was the one who bought" the Curran.[20] Accordingly, Carole "began to focus on obtaining sole control of the Company."[21]

In 2010 or 2011, Carole began instructing Greg Holland, who had been hired as SHN's CEO in 2001, not to communicate with Robert or Harris unless she and Jeff were present or part of the conversation. Yet, during that time, Carole and Holland were meeting together three or four times per week outside the presence of any Nederlander representatives. Concerned with Carole's instructions, Holland hired a personal attorney to advise him on the direction Carole had been giving him. At trial, he testified that Carole

---

[19] *Declaratory Judgment Opinion*, 2018 WL 3646817, at *6.

[20] *Id.* at *7.

[21] *Id.*

8

would often say that she viewed SHN as her company.[22] Carole also felt that she was doing most of the SHN-related work, and she thought the LLC Agreement should better reflect her work on SHN's behalf.

In January 2012, Carole emailed Thomas Hart, one of her business associates and managers of her trusts, saying:

> [I]t just seems that the partnership has grown and evolved since it was originally drawn up . . . and goodness, within me, dare I say, the Organization would be quite different, we should perhaps look at the whole document . . . it's important that I maintain CONTROL . . . so I might suggest this is the IDEAL time to completely restructure the Partnership Agreement . . . .[23]

Carole also emailed Jeff and Hart in October 2012, stating that the new Curran lease "should lead to [a] new management agreement."[24] And in January 2013, Carole emailed Hart, saying: "I think it is time together [sic] a new management agreement in place, Tom. Succession and fees are key. This is the appropriate time to involve [our lawyer] and get clarity. I firmly believe that to start with the [C]urran lease is foolish. We are in the prime spot."[25] In addition to tying the Curran lease to a new LLC agreement, Carole sent several emails in January 2013 proposing the idea of blocking SHN's ability to make distributions until a new LLC agreement was in place. The trial court, citing testimony from Holland

---

[22] *Id.* ("Greg testified that Carole would often express the opinion that, 'she had created the company, that it was her company, that it was all her money that had created the company, and that . . . it was really majority her company.'").

[23] *Id.*

[24] *Id.* Carole testified at trial that she considered it "silly business to agree to a lease without a new management agreement." *Id.*

[25] *Id.*

about Carole physically blocking an exit to a January 14, 2013 SHN board meeting, found that Carole "acted on her desire for more control."[26]

As Carole contemplated methods to leverage a new LLC agreement, Hart and Harris had been negotiating a new lease of the Curran to SHN. But in an executive session of SHN's January 28, 2014 board meeting, the Hayses told Robert that they would not continue negotiating a lease on the Curran until a new LLC agreement was contemplated. Carole demanded a new LLC agreement "to be more reflective of the time in which [they] lived, in that [Robert] was never in San Francisco, in that [she] could never get [Robert] on the phone, in that it became apparent that [Robert and Holland] were in constant communication and aligning."[27] Carole even admitted at trial that had Robert offered to give her control through a new LLC agreement, she would have approved the Curran lease "in a heartbeat."[28]

After several follow-up emails between Robert and the Hayses in February 2014, including a threat of legal action against CSH, the Hayses filed suit in the Court of

---

[26] *Id.* at *8. According to Holland's testimony:

> Carole stood in front of the door and told us that no one was leaving until she got what she want[ed]. And then she just started saying that she wanted to control the company. No one had thanked her for buying the Curran Theater for the company, and she didn't feel she deserved to be treated that way. [Robert] thanked her several times. She kept pressing that she -- you know, she deserved to have control of the company, that I wasn't providing her information. And after what felt like a long, long period of time, [Robert] agreed that she would be the sole president of SHN for a 60-day period, and that he wanted -- part of that job for her would be that she would increase sponsorships and lower costs.

*Id.*

[27] *Id.* at *9.

[28] *Id.*

10

Chancery on February 24, 2014. In its Complaint, CSH sought a declaratory judgment that it would not be in breach of the LLC Agreement or Delaware law if it did not renew the Curran lease with SHN. Carole resigned as co-president and a director of SHN on June 2, 2014, as the relationship between the Nederlander and Shorenstein-Hays factions continued to deteriorate.[29] Jeff remained a director of SHN for several more months, where, after at least one board meeting, he communicated SHN information to Carole. He did not resign as a director of SHN until October 27, 2014.

During that time, the Hayses were also planning new ventures at the Curran. On August 1, 2014, Carole invested $1 million in the musical production *Fun Home*. In return, she gained an obligation on the part of *Fun Home* to "endeavor to present the opening engagement at the Curran in San Francisco, taking into consideration the schedule and availability of the Curran," and a promise that it would not present the production in any other San Francisco area theater without Carole's approval.[30] After SHN's lease of the Curran expired on December 31, 2014, the Hayses embarked on a multi-million-dollar renovation of the Curran. The Curran reopened in 2017, after which it staged award-winning Broadway shows like *Bright Star*, *Fun Home*, and *Eclipsed*.

As the litigation in the Declaratory Judgment Action continued in 2017, the Hayses booked two more Broadway hits. First, on December 11, 2017, Carole and the producers of *Dear Evan Hansen* entered into a production agreement to play at the Curran from

---

[29] *See id.* at *11 (quoting an email from Carole to Jeff on August 2, 2014, saying that they should go at Robert and Holland "with 'guns ablaze'").

[30] *Id.* at *12.

11

December 5 to December 30, 2018. In that agreement, Carole guaranteed the producers at least $1.3 million per week in revenue.[31] Carole also promised the producers "financial protection in the event that [the Court of Chancery] enjoined the show from playing at the Curran."[32] Second, the Hayses booked *Harry Potter* for a "sit-down" production scheduled to play from the fall of 2019 through December 31, 2022. The agreement with Ambassador Theater Group ("Ambassador"), an international theater owner and operator, included:

> (1) only allowing the presentation of "an extended sit-down production of *Harry Potter*" unless a replacement production is "approved in writing in advance by [Carole]," (2) guaranteeing revenue for [Carole], (3) Ambassador agreeing to hire current Curran personnel, and (4) [Carole] maintaining control over physical alterations to the theater necessary for *Harry Potter*.[33]

Ambassador entered into a separate show license with *Harry Potter's* producers, which it signed simultaneously with its deal with CSH Curran on April 20, 2018. The producers of both *Dear Evan Hansen* and *Harry Potter* openly negotiated with multiple venues, including SHN theaters, that were competing against each other to stage the productions.[34]

On September 25, 2018, Nederlander brought the PI Action in the Court of Chancery. Nederlander argued that the defendants breached their contractual and fiduciary duties by entering into contracts to stage *Dear Evan Hansen* and *Harry Potter* in violation of the LLC Agreement. Nederlander sought to enjoin the defendants from presenting those plays at the Curran.

---

[31] *PI Decision*, 2018 WL 6271655, at *3.

[32] *Id.*

[33] *Id.* at *4.

[34] *Id.* at *11.

12

## II.    *Key Terms of the LLC Agreement*

At the center of this dispute on appeal is Section 7.02 of the LLC Agreement, which provides:

> SECTION 7.02.  <u>Cooperation and Non-Competition</u>.
>
> (a)    The Shorenstein Entity and the Nederlander Entity hereby agree to devote their efforts to maximize the economic success of the Company and to avoid any conflicts of interests between the Members.  All actions of the Members and their representatives with regard to the Company and theater matters will be carried out in good faith and in a prompt and expeditious manner.
>
> (b)    Until the termination of the Company pursuant to this Agreement, neither the Shorenstein Entity nor the Nederlander Entity will stage any Production that it controls (as defined in Section 7.03) within 100 miles of San Francisco unless (i) such Production has first played in one of the Theatres; or (ii) such Production has been rejected for booking at one of the Theatres by the other Member's representative on the Board of Directors; or (iii) the Company shares in the profits and/or losses of any booking pursuant to an agreement mutually acceptable to the Members.[35]

The "Shorenstein Entity" and "Nederlander Entity" are defined through a series of definitions, beginning with the preamble to the LLC Agreement:

> This Plan of Conversion and Operating Agreement (the "Agreement") of Shorenstein Hays-Nederlander Theatres LLC (the "Company") is entered into as of November 6, 2000 by and between CSH Theatres LLC, a Delaware limited liability company (*together with any Permitted Tranferees, as hereinafter defined, the "Shorenstein Entity"*), and Nederlander of San Francisco Associates, a California general partnership (*together with any Permitted Transferees, the "Nederlander Entity"*), as members.[36]

---

[35] App. to Opening Br. at A304–05 (LLC Agreement § 7.02).

[36] *Id.* at A285 (LLC Agreement Preamble) (emphasis added).

"Permitted Transferee" "means (a) an Affiliate of any Member or (b) in the case of a Nederlander Entity, a Nederlander Controlled Entity or any member of the Nederlander family."[37] An "Affiliate" is "a Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the subject Person."[38] "Control," "Controls," and "Controlled" are defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, through contract, or otherwise."[39] Further, a "Person" is defined as "an individual or a corporation, all types of partnership, trust, unincorporated organization, association, limited liability company or other entity."[40] "Members" means "the Shorenstein Entity and the Nederlander Entity and any additional Person who is admitted to the Company as a Member in accordance with this Agreement and is listed from time to time on the books and records of the Company."[41]

Finally, two other provisions in Section 7 are relevant to this appeal. Section 7.03 defines "control over the production" as used in Section 7.02(b):

> SECTION 7.03. <u>Most Favored Nation Treatment for Shorenstein and Nederlander Productions</u>. If either the Shorenstein Entity or the Nederlander Entity or any Affiliate thereof has control over a Production, that Production and the relevant Theatre will be accorded "most favored nation" treatment by the other in theater licensing arrangements. For purposes of this Section 7.03, *"control over production" means the Person having the ability to*

---

[37] *Id.* at A288 (LLC Agreement § 1.01).

[38] *Id.* at A286 (LLC Agreement § 1.01).

[39] *Id.* at A287 (LLC Agreement § 1.01).

[40] *Id.* at A288 (LLC Agreement § 1.01).

[41] *Id.* at A287 (LLC Agreement § 1.01).

14

*determine where the Production plays and the terms and conditions of said engagement.*[42]

Section 7.06 sets forth the parties' general ability to engage in non-SHN business:

> SECTION 7.06. <u>Outside Activities</u>. Subject to the other provisions of this ARTICLE VII, including Section 7.02, any Member, any Affiliate of any Member or any officer or director of the Company shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company, and may engage in the ownership, operation and management of businesses and activities, for its own account and for the account of others, and may (independently or with others, whether presently existing or hereafter created) own interests in the same properties as those in which the Company or the other Members own an interest, without having or incurring any obligation to offer any interest in such properties, businesses or activities to the Company or any other Member, and no other provision of this Agreement shall be deemed to prohibit any such Person from conducting such other businesses and activities. Neither the Company nor any Member shall have any rights in or to any independent ventures of any Member or the income or profits derived therefrom.[43]

### III. *The Court of Chancery Proceedings*

#### A. *The Declaratory Judgment Action*

CSH sued Nederlander in the Court of Chancery on February 24, 2014, seeking a declaratory judgment that CSH would not be in violation of the LLC Agreement if it did not renew the Curran lease. Nederlander counterclaimed against CSH and asserted third-party claims against CSH Curran, Carole, and Jeff, including breaches of the LLC Agreement and breaches of the Hayses' fiduciary duties, among other claims. As to the breach of the LLC Agreement, Nederlander asserted "that the Hayses were competing directly with SHN, misappropriated SHN's confidential information, and used the Curran

---

[42] *Id.* at A305 (emphasis added) (LLC Agreement § 7.03).

[43] *Id.* (LLC Agreement § 7.06).

15

as a means of attempting to seize control of the Company."[44]  The related common law

fiduciary claims[45] focused on "(1) the competing shows; (2) the withholding of the Curran

lease, (3) alleged misuse of confidential information; and (4) waste of assets."[46]

Nederlander sought relief in the form of damages, a permanent injunction, a declaratory

judgment, and specific performance of renewal of the Curran lease.

CSH moved to dismiss Nederlander's claims.  In its April 21, 2015, Motion to

Dismiss Opinion, the Court of Chancery granted in part and denied in part CSH's motion

to dismiss.[47]  In that opinion, the court evaluated some of the contractual issues now

relevant on appeal, and it held that the LLC Agreement was unclear in two respects.  *First*,

the court held that the definition of "Shorenstein Entity" was ambiguous.  The court noted

that a literal reading of the LLC Agreement's definitions includes "Affiliates" in the

definition of "Shorenstein Entity."[48]  As CSH pointed out, however, other provisions such

---

[44] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *8 (Del. Ch. Apr. 21, 2015) [hereinafter *Motion to Dismiss Opinion*].

[45] The common law fiduciary claims and allegations of a breach of the LLC Agreement overlapped below.  *See id.* at *8 n.37 ("Indeed, the parties' briefing sometimes conflated the analysis of the breach of the LLC Agreement Count with the breach of fiduciary duty Count, making it difficult to disentangle these distinct theories of alleged wrongdoing.").

[46] *Id.* at *11.

[47]  The Court of Chancery dismissed Count I (breach of fiduciary duty against the Hayses) to the extent Nederlander alleged waste, dismissed Count III (fraudulent inducement) entirely, and dismissed Count V (promissory estoppel) as to Jeff.  *Id.* at *23.  The court denied CSH's motion to dismiss as to the remaining Counts.

[48] *Id.* at *10 ("The definitions [in the LLC Agreement] reveal the problem: the family entities (the Members) are defined to include Permitted Transferees, which itself is defined to include Affiliates.  Thus, according to Nederlander, any time the family entities are referred to in a provision of the LLC Agreement, Affiliates definitionally are included. . . . [CSH] contend[s] that the reference in the definition of the Shorenstein Entity to the term Permitted Transferee contemplates some form of future transfer from CSH to, for example, a successor entity within the defined set of Permitted Transferees.  That successor entity would assume the Shorenstein Entity's

as Section 7.03 refer to "the Shorenstein Entity . . . or *any Affiliate thereof*," indicating that the parties may not have intended to bind Affiliates. Because the court held that CSH's interpretation was not the only plausible one, it declined to dismiss Nederlander's allegations of breach of the LLC Agreement.[49]

*Second*, the court held that the definition of "control" in Section 7.03 could have two potentially reasonable interpretations. CSH essentially argued that, because neither a producer nor theater owner could unilaterally set the terms of staging any play, "control" only encompasses actions in which the producer also owned the theater—although the court noted that "[i]t is questionable whether this extremely narrow interpretation is reasonable."[50] The court found Nederlander's interpretation to be reasonable in that, "[b]ecause the family entities appear to be in the business of running theaters, rather than producing plays, the language and structure of Sections 7.02 and 7.03 seemingly contemplate shows being under one of the entities' 'control' even though the entity controls

---

interest in SHN. In other words, at any given point in time, the 'Member' of SHN on the CSH side would be either the initial Shorenstein Entity or a Permitted Transferee, but not both. . . . The LLC Agreement, read literally, defines the Shorenstein Entity to include Affiliates. Thus, even if [CSH's] interpretation is plausible, I cannot say that it is the only reasonable one.").

[49] *Id.* ("Resolving all ambiguities in favor of Nederlander as the nonmoving party, I must recognize that the LLC Agreement could be construed to impose restrictions on Affiliates of CSH, including Mrs. Hays. It is reasonably conceivable, therefore, that, when CSH's Affiliates' behavior is included in the analysis, Nederlander could prove a breach of the LLC Agreement, such as a violation of the duty imposed in Section 7.02(a) requiring the Shorenstein Entity to work toward maximizing SHN's economic success.").

[50] *Id.* at *13.

17

only the venue."[51] Regardless, because the definition of "control" was possibly ambiguous, the court refused to dismiss that aspect of Nederlander's claims.

The parties proceeded to trial in late 2017, and the Court of Chancery issued its Declaratory Judgment Opinion on July 31, 2018. The Court of Chancery first held that Nederlander failed to meet its burden of showing that Carole promised to renew the lease of the Curran to SHN[52] or that the promise was otherwise enforceable.[53] The Court of Chancery also held that there were no contractual breaches, but that the Hayses breached their common law fiduciary duties while serving as directors and managers of SHN. The court first addressed the contractual claims. Looking to the plain text of the LLC Agreement, the court analyzed the definition of "Shorenstein Entity":

> The LLC Agreement defines the "Shorenstein Entity" as CSH Theatres "together with any Permitted Transferees." For the Shorenstein Entity, a Permitted Transferee is "an Affiliate." An Affiliate is "a Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the subject Person." Under the LLC Agreement, a Person is "an individual or a corporation, all types of partnership, trust, unincorporated organization, association, limited liability company or other entity." Control, Controls, or Controlled "means the possession, direct or indirect, of the power to direct or cause the direction of the management and polices of a Person, whether through the ownership of voting securities, through contract, or otherwise."

---

[51] *Id.*

[52] *Declaratory Judgment Opinion*, 2018 WL 3646817, at *15 ("Based on the testimony and all the other evidence presented at trial, I find that [Nederlander] has not shown by a preponderance of the evidence that Carole promised to rent the Curran to the Company after the expiration of the Lurie Lease.").

[53] *Id.* at *15–19.

18

Under these definitions in the LLC Agreement, the Hayses and any entities they control are Affiliates and part of the Shorenstein Entity and, therefore, are bound by Section 7.02(a).[54]

CSH objected to the court's interpretation of "Shorenstein Entity" because of the LLC Agreement's definition of "Members," which is defined as "the Shorenstein Entity and the Nederlander Entity," along with subsequently admitted members. If CSH is not synonymous with "Shorenstein Entity" and Nederlander is not synonymous with "Nederlander Entity," CSH argued, it would lead to absurd results in other provisions. The trial court recognized that it "may well be the case" that its interpretation could lead to absurd results, but it noted that if it were to adopt CSH's interpretation, the string of definitions stemming from "Shorenstein Entity" would "become mere surplusage."[55] The court also reasoned that the drafters of the LLC Agreement used "Members" in certain provisions and "the Shorenstein Entity and the Nederlander Entity" in others, "which suggests the terms mean different things."[56] The court held that CSH's argument raised an ambiguity at the most.

Because of that possible ambiguity, the trial court considered extrinsic evidence. Looking at the supplement to the partnership agreement executed in 1992 that was meant to guard against competition by the Nederlanders, the court concluded that "[t]he only way Walter and Carole's fears of competition by the Nederlanders are assuaged is if Nederlander Entity means more than just NSF Associates, which is consistent with the

---

[54] *Id.* at \*23.

[55] *Id.* at \*25.

[56] *Id.*

19

definition in the LLC Agreement."[57]   That is, if the partnership agreement or LLC Agreement applied only to Nederlander and CSH, it would do nothing to limit Nederlander competition—"'the most important thing' the agreement was meant to do."[58]  Additionally, the court found that Nederlander's course of conduct favored the court's interpretation. For example, Nederlander Affiliates in the San Francisco area made offers to SHN to participate in some, but not all, shows.  The court reasoned that those offers would only be necessary if Affiliates believed they were bound by Section 7.02.[59]

Despite holding that the Hayses and their affiliated entities are part of the "Shorenstein Entity" bound by Section 7.02(a), the court held that "[w]hile Section 7.02(a) requires the 'Shorenstein Entity' to 'devote their efforts to maximize the economic success of the Company and avoid any conflicts of interest between the Members,' Section 7.06 contains an exception to this broad provision."[60]  The trial court further held that "[t]his exception is itself limited by Section 7.02(b)."[61]  In other words, the Shorenstein and Nederlander Entities may compete with SHN unless that competition violates Section 7.02(b)—that is, if it occurs in the form of staging a controlled production within one-hundred miles of San Francisco, assuming none of the exceptions in Section 7.02(b) applies.

---

[57] *Id.* at *26.

[58] *Id.* (quoting Robert's trial testimony).

[59] *Id.* at *27.

[60] *Id.* at *24 (footnotes omitted).

[61] *Id.*

20

The court held that, by staging *Fun Home*, Carole appeared to have violated the general prohibition in Section 7.02(b) on staging controlled productions within one-hundred miles of San Francisco because she had invested $1 million in the venture and received the right of first refusal to stage the production in the Bay Area.[62] Thus, Carole had "control" of *Fun Home* as defined in Section 7.03. Although *Fun Home* had not played at either of SHN's theaters, the court noted that there was no evidence in the record regarding whether the other exceptions to the one-hundred-mile prohibition applied, *e.g.*, whether the Nederlanders had rejected *Fun Home* or entered a profit-sharing agreement with CSH's presentation at the Curran. Because of those failures of proof, along with Nederlander's failure to prove damages related to the staging of *Fun Home*, the court held that Nederlander had not satisfied the final element in its breach of contract claim.[63]

---

[62] *Id.* at \*25 ("[Carole] entered into an investment agreement with the production *Fun Home* on behalf of her entity CSH Productions, LLC. As part of that agreement, *Fun Home* agreed that if the production went on tour it would not perform at any other Bay Area theater but the Curran as it was understood that an important inducement for [Carole's] significant investment in the Broadway Production is to obtain the first right to present the first commercial production of the Play in the Bay Area, preferably to launch the national tour. This concession constitutes control over the production as defined in Section 7.03 because it allows Carole the ability to determine where the Production plays and the terms and conditions of said engagement. *Fun Home* played at the Curran in 2017. This means Carole staged a production that she controlled within 100 miles of San Francisco." (citations and quotations omitted)).

[63] *Id.* ("*Fun Home* did not play at either of the Company's theaters, but the post-trial briefs do not point to any evidence regarding whether the Nederlanders rejected *Fun Home* for the Company or if the Company shared in the profits and losses of *Fun Home*. [Nederlander] has the burden to prove its case by a preponderance of the evidence. Even if there is evidence in the record that shows Carole did not adhere to Section 7.02(b), [Nederlander] has not offered any evidence regarding its damages relating to *Fun Home* and, thus, has not satisfied the final element for its breach of contract claim." (citations omitted)).

As to the common law fiduciary claims, the court held that Carole breached her duty of loyalty as a director and co-president of SHN by (1) threatening fellow board members with refusing to approve the subscription series[64] unless Robert agreed to give her more control of SHN, (2) using her fiduciary position to prevent SHN from pursuing shows she wanted for her competing business, and (3) instructing Holland not to communicate with her co-president and fellow SHN directors.[65] Likewise, the court held that Jeff breached his common law fiduciary duties as a director of SHN by sharing confidential information with a director of a competitor company and attempting to secure confidential information to hire away SHN's employees. "These actions were not in the best interest of the Company; instead the Hayses took these actions, while acting in their capacities as fiduciaries of the Company, to advance their own interest at the expense of the Company."[66]

As to damages, Nederlander presented "one unified remedy theory" in which it alleged that the Hayses' conduct was part of a larger scheme to take control of SHN, or, if that failed, to sabotage and improperly compete with SHN.[67] The court held that it was unable to award damages for the parts of Nederlander's case that it was able to prove

---

[64] The subscription series is a significant income-generator for SHN. "'A subscription, really everywhere in the country for Broadway, is five to seven shows that are put in a package that you buy at once, similar to a sports season ticket. Subscribers get special benefits, typically discounts, opportunity to get gifts, better seats than everywhere else.'" *Id.* at *9 n.123 (quoting Holland's trial testimony).

[65] *Id.* at *27. The common law fiduciary duty breaches are not at issue in this appeal.

[66] *Id.*

[67] *Id.* at *29. This theory alleged "breaches of both contractual and fiduciary duties." *Id.*

because "it has given me no way to separate the actual harm to the Company from the consequences of allowed behavior by the Hayses."[68] Specifically, the court observed that:

> [Nederlander] has not provided the Court with *any* information about the harm caused to the Company by (1) the Company's reliance on the purported promise to lease the Curran to the Company—e.g., the rebranding of the Curran and the booking of shows into the Curran after December 31, 2014; (2) the Hayses attempting to steal shows from the Company; (3) the Hayses presenting shows that violate Section 7.02(b); (4) Carole's threats and actions that violated her fiduciary duties while she was a manager of the Company; or (5) Jeff's disclosure of confidential information to Carole while he was a manager of the Company. *Any attempt by the Court to determine the harm caused by these actions would be entirely speculative conjecture, and thus, I award only nominal damages for the breaches of fiduciary duty.*[69]

On September 20, 2018, the Court of Chancery entered its final order and judgment in the Declaratory Judgment Action.[70] The court ruled in favor of CSH on its sole count of declaratory judgment, holding that it did not breach the LLC Agreement or any other duty by not renewing the Curran lease with SHN. As to Nederlander's Counterclaims, the court entered judgment on Count I (breach of common law fiduciary duties) in Nederlander's favor and awarded nominal damages. The court also enjoined the Hayses from using confidential SHN information to compete with SHN. Further, the court granted partial relief as to Count VI (declaratory judgment), in which the court declared that Section 7.02(b) applies to CSH and its Affiliates as a part of the Shorenstein Entity and that the

---

[68] *Id.*

[69] *Id.* at *30 (emphasis added). Further, Nederlander's expert witness, Dr. John Hekman, did not calculate damages for "poaching" individual shows. *See* App. to CSH Answering Br. at B337 (Dr. John Hekman Testimony).

[70] *See CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2018 WL 4522728 (Del. Ch. Sept. 20, 2018).

23

Hayses breached their fiduciary duties as directors and managers of SHN. However, the court declared that CSH may operate the Curran in competition with SHN as long as it complies with Section 7.02(b). The trial court denied all other claims asserted under Count VI (declaratory judgment), and it dismissed all remaining counts in Nederlander's Counterclaims.[71] Finally, the court awarded attorney' fees and costs of $32,219.94 to Nederlander for Carole's bad faith deposition conduct.[72]

Following issuance of the post-trial decision and final judgment in the Declaratory Judgment Action, on August 6, 2018, Nederlander and SHN filed a Motion for Clarification. They argued that "the Opinion should be clarified to state that the Shorenstein Entity must comply with Section 7.02(b) with respect to *Dear Evan Hansen* and *Harry Potter*."[73] The trial court denied the motion, holding that "the existence of *Dear Evan Hansen* and *Harry Potter* is not new evidence about the definition of control under Sections 7.02(b) and 7.03 of the LLC Agreement," and that, "[i]nstead, these productions at the Curran are new potential breaches, and Counterclaim Plaintiff will have to litigate them as such."[74]

B.      *The PI Action*

Accordingly, and on September 25, 2018, Nederlander filed the PI Action in the Court of Chancery to prevent the Hayses from staging *Dear Evan Hansen* and *Harry Potter*

---

[71] Following the Motion to Dismiss Opinion, the remaining claims consisted of Counts II (breach of the LLC Agreement), IV (breach of contract), and V (promissory estoppel).

[72] *See* Addendum; Ex. C to Opening Br. (Nov. 1, 2018 Order).

[73] App. to CSH Answering Br. at B446 (Order Denying Mot. for Clarification).

[74] *Id.* at B446–47.

at the Curran, arguing that they controlled both productions and had breached Section 7.02(b).[75]  In part of its analysis in the PI Decision, the court interpreted Nederlander's argument to mean that *staging* virtually any production at the Curran amounts to *control* as defined in Section 7.03.  The court rejected that argument for several reasons.

*First*, the court held that Nederlander's interpretation would turn "large parts of Section 7 of the LLC Agreement into 'mere surplusage.'"[76]  *Second*, although the court considered Section 7.02 unambiguous, it looked to extrinsic evidence for additional support.  It noted that Section 4 of the partnership agreement barred staging *any* production, while Section 7.02(b) of the LLC Agreement narrowed the provision to *controlled* productions.  The trial court concluded from that change "that 'stage' and 'control' do not have the same meaning."[77]  *Third*, the court distinguished *Dear Evan Hansen* and *Harry Potter* from *Fun Home*—which the court held in the Declaratory Judgment Action was a Hays-controlled production—based on several important facts that Nederlander had acknowledged.  Thus, because "[s]taging does not mean control under the LLC Agreement," the court held that Nederlander "failed to show a likelihood of success on the

---

[75] Nederlander moved for expedited proceedings, which the trial court granted on October 5, 2018 in a telephonic hearing.

[76] *PI Action*, 2018 WL 6271655, at *11; *see also id.* at *10 ("If, as Plaintiff contends, to stage a production is to control it, Section 7.02's limits on a member or affiliate's ability to 'stage a Production that it controls (as defined in Section 7.03)' is repetitive, because 'that it controls (as defined in Section 7.03)' adds nothing to the sentence.  This interpretation creates surplusage." (citations omitted)); *id.* ("[Nederlander's] interpretation would reduce Section 7.06 to only allowing competition when the member or affiliate is a passive, uninvolved investor.  This interpretation would make large parts of Section 7.06—for example, the language regarding the ability to operate and manage a business for its own account and others' accounts—unnecessary surplusage.").

[77] *Id.* at *10.

merits" necessary to win a preliminary injunction.[78] The court then entered final judgment as to Nederlander's alleged breach of Section 7.02(b) pursuant to Court of Chancery Rule 54(b).

## IV.    Claims on Appeal

Nederlander raises two arguments on appeal. *First*, as to the Declaratory Judgment Action, it argues that the Hayses breached their duty under Section 7.02(a) to maximize SHN's economic success by staging competing productions at the Curran.[79] Nederlander claims that the Court of Chancery erred by subjecting Section 7.02(a) to Section 7.06, which the court held allowed competition unless that competition violated Section 7.02(b). Nederlander did not appeal (and did not discuss in its opening brief) any of the trial court's rulings denying relief in the form of damages, declaratory relief (as to renewal of the lease), permanent injunctive relief, or disgorgement. *Second*, Nederlander argues, in the alternative,[80] that the court erred in the PI Action by holding that the Hayses did not

---

[78] *Id.* at *11.

[79] The issues concerning the renewal of the Curran lease and the staging of *Fun Home* are not at issue on appeal. Further, Nederlander does not assert common law fiduciary claims on appeal. Rather, Nederlander frames its argument concerning improper competitive conduct as a violation of a contractual duty of loyalty under Section 7.02(a). *See* Opening Br. at 24 ("That language [in Section 7.02(a)] expressly imposes upon the parties a contractual and fiduciary duty of loyalty to SHN." (citations omitted)); Oral Argument Video at 15:20–15:44, https://livestream.com/DelawareSupremeCourt/events/8670837/videos/191018409 (Q: "And as I read your brief, your fiduciary duty argument is, on appeal, limited to the contractual fiduciary duties as opposed to the common law fiduciary duties?" A: "Right. We are arguing that the contractual fiduciary duty of loyalty that's in the contract comports with and is coterminous with duty of loyalty under common law. But the source of that duty on what we're appealing is the contractual duty.").

[80] *See* Opening Br. at 4–5 ("If this Court credits [the Section 7.02(a)] Argument and reverses on that basis, that would dispose of both appeals. Argument II is made on the alternative assumption

26

"control" *Dear Evan Hansen* and *Harry Potter*, and that the trial court "mischaracterized" and "misunderstood" its arguments. Nederlander does not challenge any of the factual findings relating to that decision.[81]

On cross-appeal, CSH contends that Nederlander's arguments are irrelevant because the trial court incorrectly held in the Declaratory Judgment Action that CSH's Affiliates, including the Hayses, are bound by Section 7.02. CSH also contends that Nederlander waived any claim under Section 7.02(a) because it abandoned that theory in the Declaratory Judgment Action.

## V. Standard of Review

"This Court 'will uphold the trial court's factual findings unless they are clearly erroneous.' We review questions of law and contractual interpretation, including the interpretation of LLC agreements, *de novo*."[82]

---

that, even if this Court were to reject Argument I, the court nonetheless reversibly erred in denying the injunctive relief sought in the [PI Action].").

[81] *See* Nederlander Reply Br. at 35 n.92 ("NSF does not dispute any of the trial court's factual findings. NSF's procedural decision to seek a final judgment on those facts does not, as Appellees suggest, waive its right to argue that the court misinterpreted NSF's legal theory based on those facts."); Oral Argument Video at 14:31–15:20, https://livestream.com/ DelawareSupremeCourt/events/8670837/videos/191018409 (Q: "In the PI Action, you're not challenging the court's actual factual findings, are you? Rather, you're saying she misconstrued your position in your argument?" A: "The principal error by the trial court in the PI finding was to misconstrue the term 'control,' that's essentially a legal interpretation question. What does the contract mean? We respectfully believe she got it wrong. Against the right standard, our facts speak for themselves. She didn't dispute the individual factual findings . . . she just said this body of evidence didn't meet a test that, with all respect, the court came up with on its own—pre-existing contractual right, which isn't in the agreement, wasn't argued by either side.").

[82] *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816 (Del. 2018) (quoting *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del. 2012)).

*VI.    Analysis*

We first address the threshold question on cross-appeal, in which CSH argues that the Court of Chancery erred by holding that CSH Affiliates are included in the definition of "Shorenstein Entity."  Next, we consider Nederlander's primary argument on appeal: that the Court of Chancery erred in its interpretation of Section 7.02(a) in the Declaratory Judgment Action.  We conclude by addressing Nederlander's alternative argument that the court erred in the PI Action by holding that CSH does not "control" *Dear Evan Hansen* and *Harry Potter*.

We agree with Nederlander that the Court of Chancery misinterpreted Section 7.02(a), and we reverse that aspect of that decision.  But we decline to order a remand in the Declaratory Judgment Action because Nederlander has not challenged the trial court's ruling in that action that it failed to prove damages relating to its contractual or fiduciary claims.  Nor does it address on appeal in any way the denial of other possible forms of relief.  However, reversal of the trial court's interpretation of Section 7.02(a) in the Declaratory Judgment Action impacts the decision in the PI Action.  Although we are reluctant to remand the PI Action for the reasons stated below, we reverse and remand for further proceedings consistent with this Opinion.

A.    *We Affirm the Court of Chancery's Interpretation of "Shorenstein Entity" in the Declaratory Judgment Action*

On cross-appeal, CSH argues that the Court of Chancery erred in the Declaratory Judgment Action by holding that "Shorenstein Entity" includes CSH Affiliates, including the Hayses, and therefore Section 7.02 does not bind Affiliates of CSH.  It relies on both

28

the plain language of the LLC Agreement and extrinsic evidence. If CSH is correct that Section 7.02 binds only Nederlander and CSH, then Nederlander's arguments on appeal must fail.

We interpret contracts "as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage," and "will not read a contract to render a provision or term meaningless or illusory."[83] "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions."[84] "When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[85] Applying those principles, we affirm the Court of Chancery's interpretation of "Shorenstein Entity."

CSH advances two primary arguments in support of its position that "Shorenstein Entity" means only CSH. *First*, it argues that as a general principle, only formal parties— CSH and Nederlander—are bound by the terms of the LLC Agreement. As such, "Permitted Transferees" refers only to parties that may one day become "Members" and thereafter part of the Shorenstein Entity. *Second*, CSH argues that the trial court's interpretation creates absurdities and surplusage. For example, because the term "Members" in the LLC Agreement is defined as the Shorenstein and Nederlander Entities,

---

[83] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotations omitted).

[84] *Id.* at 1159–60.

[85] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (citing *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 55 (Del. Ch. 2001)).

the trial court's interpretation would grant Affiliates the same distribution and voting rights as Nederlander and CSH. Additionally, CSH argues that other sections of the LLC Agreement, such as Section 7.03, include terms like "the Shorenstein Entity or the Nederlander Entity *or any Affiliate thereof*," which would be superfluous if the entities include Affiliates by definition.

We reject both of CSH's arguments. Plainly read, "Permitted Transferees" is defined as "an Affiliate of any Member"—not an Affiliate of any Member who has received or will receive transferred membership interests. Contracts may impose obligations on affiliates in this context.[86] Additionally, the LLC Agreement contains some inconsistencies and contractual surplusage regardless of whose interpretation is applied. For example, CSH's interpretation renders the definition of "Shorenstein Entity" and "Nederlander Entity" in the preamble to the LLC Agreement mere surplusage, and the trial court's interpretation renders some of the language in provisions like Section 7.03 unnecessary. Further, as the trial court noted, the LLC Agreement uses both "Members" and "Nederlander Entity" or "Shorenstein Entity," which suggests that they have different meanings.

---

[86] *See Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *18 (Del. Ch. Aug. 18, 2016) (holding that where an agreement included "Affiliates" within the definition of "Parties," the agreement imposed obligations on a contractually-defined affiliate that was under the control of a party to the agreement); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010) (where an agreement defined the term "affiliate" to include "any entity which either party now or hereafter, directly or indirectly, owns or controls," the court held that the phrase "now or hereafter" unambiguously contemplated that the agreement would apply to later-acquired or formal entities owned or controlled by the parties to the agreement).

30

We agree with the Court of Chancery's initial determination in the Motion to Dismiss Opinion that those inconsistencies render the meaning of "Shorenstein Entity" and "Nederlander Entity" ambiguous.[87]  Nonetheless, CSH argues that the extrinsic evidence supports its interpretation.[88]  We disagree and instead find no fault with, and defer to, the trial court's evaluation of the extrinsic evidence.[89]

In light of the previous litigation between the Nederlander and Shorenstein partners, the trial court noted that limiting competition from the Nederlanders was "'the most important thing' the agreement was meant to do."[90]  The court also reasoned that limiting the partnership and LLC Agreements to only the partner or member entities "would do nothing to limit competition" from the Nederlanders.[91]  Indeed, under CSH's interpretation, it could set up a shell entity next door to the other theaters and compete directly with SHN's core business.  Further, the trial court found that Nederlander Affiliates in or near San Francisco had made offers to SHN to participate in certain shows.[92]  That is, the conduct of Nederlander Affiliates indicates that they considered themselves to be bound by Section

---

[87] *See Motion to Dismiss Opinion*, 2015 WL 1839684, at *9–*10.

[88] Specifically, CSH points to Robert's trial testimony, Section 4 of the partnership agreement (which CSH argues applied only to the partners), and the conduct of Nederlander's alleged Affiliates, such as Broadway San Jose.

[89] *See Declaratory Judgment Opinion*, 2018 WL 3646817, at *25 ("[A]t most, Counterclaim Defendants have raised an ambiguity in the contract that allows me to look at extrinsic evidence, and the extrinsic evidence supports [Nederlander]'s interpretation of Section 7.02.").

[90] *Id.* at *26 (quoting Robert's trial testimony).

[91] *Id.*

[92] *Id.* at *27.

31

7.02. We agree with the Court of Chancery that Affiliates are bound by Section 7.02, and we affirm that aspect of the Declaratory Judgment Opinion.

B.    *The Court of Chancery Erred in Interpreting Sections 7.02(a) and 7.06*

Nederlander argues on appeal that the Court of Chancery misinterpreted Section 7.02(a) of the LLC Agreement in the Declaratory Judgment Opinion by subjecting it to Section 7.06, which, the court held, allows competition between CSH and SHN subject to the limitations in Section 7.02(b). CSH argues that the court's determination was correct, but that we need not reach the merits of that argument because Nederlander abandoned its Section 7.02(a) claim below. We first address the threshold issues of abandonment and waiver in the Declaratory Judgment Action, followed by the merits of Nederlander's Section 7.02(a) argument. We conclude that Nederlander fairly raised its Section 7.02(a) argument in the Declaratory Judgment Action, but that the Court of Chancery erred in its interpretation of that provision.

1.    *Nederlander Fairly Presented its Section 7.02(a) Claim in the Declaratory Judgment Action*

CSH's contention that Nederlander did not fairly present its Section 7.02(a) argument in the Declaratory Judgment Action largely focuses on two points. *First*, CSH claims that Nederlander abandoned its Section 7.02(a) argument in its briefing. A review of the briefing below reveals that this argument is incorrect. In Count II of its counterclaims, Nederlander alleged that:

> Section 7.02(a) of the LLC Agreement requires members and their affiliates to devote their efforts to maximize SHN's economic success, avoid conflicts of interests between members, and act in regard to the Company and theatre matters in a good faith and prompt and expeditious manner. . . . By failing

32

to act in good faith by withholding use of the Curran Theatre, lying in regard to the purchase-lease agreement, stalling lease renewal efforts, blocking theatre sponsorships and advertisements, wasting corporate assets, promoting their own interests to the detriment of SHN, directly competing with SHN, using SHN's confidential and proprietary information to further this competition, and attempting to seize control of the Company and unilaterally rewrite the terms of the LLC Agreement, CSH, through Mr. and Mrs. Hays, has breached the LLC Agreement.[93]

Nederlander likewise consistently advanced Section 7.02(a) in its pretrial briefing, either expressly or by referencing language found only in Section 7.02(a):

- "The LLC Agreement obligates the Shorenstein Entity (CSH) and its Affiliates (the Hayses and CSH Curran) to devote their efforts to maximize the economic success of SHN and to avoid any conflicts of interest between the Members. JX 10, LLC Agreement §7.02(a). It provides further that all actions of CSH, its Affiliates, and their representatives must be carried out in good faith and in a prompt and expeditious manner."[94]

- "The Hays Group has breached the fiduciary and contractual duties owed to SHN and NSF. . . . [T]he Hays Group and CSH refused to act in the best interest of SHN and to maximize SHN's business. Most significantly, the Hays Group refused to lease the Curran Theater to SHN and, over the recommendation of their attorneys, established a competing business at the Curran."[95]

- "The fiduciary duties CSH and the Hayses owed to [Nederlander] and SHN are mirrored in the LLC Agreement, which obligates the Shorenstein Entity to devote its efforts to maximize the economic success of SHN and to avoid any conflicts of interest between the Members. . . . The Hays Group willfully and in bad faith breached these obligations."[96]

---

[93] App. to Opening Br. at A423 (Nederlander's Counterclaims and Third Party Complaint).

[94] *Id.* at A569 (Nederlander Pretrial Opening Br.).

[95] *Id.* at A570–71 (citing Section 7.02(a)) (internal citations omitted).

[96] *Id.* at A615 (citing Section 7.02(a)) (Nederlander Pretrial Answering Br.).

Finally, Nederlander preserved its Section 7.02(a) arguments in its post-trial briefing:

- "Perhaps most egregious, the Hayses' position, if accepted, would permanently harm SHN, leaving the Company to face a lifetime of improper competition from a 50% owner, which started this unlawful competition while its principals were SHN officers or directors, with duties of loyalty and duties to maximize SHN's economic success."[97]

- "Section 7.02 of the LLC Agreement imposes duties on the Hays Group, including duties to 'maximize the economic success of [SHN]'; 'avoid any conflicts of interest between the Members'; act 'in good faith'; and avoid competition within 100 miles of San Francisco unless certain conditions (not met here) have been satisfied. Mr. Nederlander and Mr. Harris have always understood that Section 7.02 binds both the Nederlander and Shorenstein affiliates. Prior to trial, the Hayses admitted that, as directors, officers, or owners, they had duties to act in SHN's best interests, maximize the company's success, act in good faith, maintain SHN's confidential information, avoid conflicts between the Members, and not compete with SHN within 100 miles."[98]

- "These [fiduciary] duties are mirrored in the LLC Agreement. *See* . . . §7.02(a) (imposing duties to maximize SHN's economic success; avoid Member conflicts; and carry out actions in good faith) . . . . The evidence establishes conclusively that the Hays Group knowingly acted in bad faith, breached the duty of loyalty, and caused CSH to breach the contractual duties in the LLC Agreement by: Competing against SHN, and not acting in SHN's best interests, by presenting Broadway shows at the Curran that SHN sought to present . . . [f]ailing to otherwise act in the best interests of SHN, and to maximize SHN's business, by refusing to renew the Curran lease; attempting to bar SHN's CEO from meeting with agents and producers . . . . None of these actions was in SHN's best interest. Rather, they were taken solely to benefit the Hayses and their competing business at the Curran. By putting their own interests ahead of SHN's interests, the Hays Group breached the LLC Agreement and the duty of loyalty (including the duty to act in good faith)."[99]

- "The Hayses were warned by counsel that operating the Curran outside of SHN would expose them to litigation risk, and the Hayses acknowledged that

---

[97] *Id.* at A762–63 (Nederlander Post-Trial Opening Br.).

[98] *Id.* at A785 (internal citations omitted).

[99] *Id.* at A810–12 (internal citations omitted).

34

they had duties not to compete, to maximize SHN's economic interests, and to maintain SHN's information in confidence. They knowingly violated each of these duties."[100]

Although Nederlander's post-trial briefs clearly focused much more on Section 7.02(b) than Section 7.02(a), Nederlander fairly raised and preserved its Section 7.02(a) argument in its briefing in the Declaratory Judgment Action.

*Second*, CSH argues that Nederlander waived its Section 7.02(a) claim because Robert "unequivocally testified that Section 7.02(a) applies to 'just NSF' 'on the Nederlander side, and that NSF's Permitted Transferees 'didn't have to' 'devote[] their efforts to maximizing the success of SHN.'"[101]  The Court of Chancery made no findings concerning the credibility or meaning of Robert's testimony on this point, and it declined to afford any weight to the "inordinate emphasis" the parties placed on fact witnesses' testimony on legal questions.[102]  Further, read in its full context, Robert's testimony appears

---

[100] *Id.* at A840 (internal citations omitted).

[101] CSH Answering Br. at 39 (internal citations omitted).

[102] *Declaratory Judgment Opinion*, 2018 WL 3646817, at *22 n.248 ("Both parties put an inordinate emphasis on the witnesses' opinions about various legal questions.  None of the witnesses are experts on Delaware law, and even if they were, questions of legal interpretation are reserved for the Court.  Thus, I do not allocate weight to the legal opinions of fact witnesses."). We agree with the trial court's observation on that point. Additionally, CSH's reliance on *Oxbow Carbon & Minerals Holdings v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482 (Del. 2019) is misplaced.  In *Oxbow*, we quoted a principal's testimony concerning his understanding of an LLC agreement that was consistent with, and an example of, a position that a party and its counsel actually took in the Court of Chancery.  That position was directly inconsistent with a new argument that party raised on appeal. *Id.* at 508–09.  Here, Robert's testimony was vacillating and inconsistent.  To the extent his testimony suggests that Affiliates are not bound by Section 7.02(a), that testimony was inconsistent with the position that Nederlander argued below and which it has consistently maintained on appeal. *See* App. to CSH Answering Br. at B431 (Nederlander's Post-Trial Oral Argument) (acknowledging Robert's testimony in a slide deck but clarifying that it did "Not Comport with Plain Language" and does not change the "Plain Language of the LLC

to be inconsistent on its face.[103]  Based upon the record before us, we decline to conclude

that Robert's inconsistent trial testimony effected a waiver of Nederlander's Section

7.02(a) argument.

### 2.  *The Court of Chancery Misinterpreted Section 7.02(a)*

Nederlander contends that the Court of Chancery erred because finding that

"Section 7.06 allows competition, without regard to the obligations expressed in Section

7.02(a), contravenes the plain language of the LLC Agreement and deprives Section

---

Agreement"); *id.* at B438 (stating that Robert's testimony was "inconsistent with [its] interpretation").

[103] *See, e.g.*, App. to CSH Answering Br. at B267–75 (Robert's Oct. 25, 2017 Testimony) (Q: "There was no obligation that was imposed here on other members of the Nederlander family; right?"  A: "We took care of that.  It was an obligation, basically, in the Nederlander family and the Shorenstein family."  Q: "Well, let me just be clear about something.  When this deal was signed in 1992 . . . May 22, 1992, you personally, Robert E. Nederlander, Sr., you didn't think you were required to devote your efforts to maximizing the economic success of the partnership, did you?"  A: "Robert Nederlander personally?  No.  I didn't think so." . . . Q: "You didn't yourself get involved in the day-to-day negotiations of [the LLC Agreement], did you?"  A: "I was concerned that we carry forward some of those documents - - I haven't looked at this in some time - - which basically says, in effect, that everybody is bound by this, relatives and otherwise.  That's why the Shorenstein entity and the Nederlander entity are bound by this.  This is not something that - - I have to look at it, but 'Permitted Transferees' in the case of - - are any member of the Nederlander family.  Nederlander family, I think, is - - I haven't looked at it - - is the descendants of David Nederlander.  And that includes all the Nederlanders.  So Walter [Shorenstein] was protected, that any Nederlander entity is bound by this.  Any Nederlander descendent is bound by this.  Just like any Shorenstein entity is bound by this, including family members."); *id.* at B293–94 (Robert's Nov. 28, 2017 Testimony) (Q: "You said [in the October 25, 2017 cross-examination] that your brother, Jimmy Nederlander, and your nephew, Jimmy, Jr., were not required by Section 7.02(a) to devote their efforts to maximizing the success of SHN.  Correct?"  A: "Yes."  Q: "Is it also correct that your two sons, Robert, Jr. and Eric, were not required by this contract, Section 7.02(a), to devote their efforts to maximizing the economic success of SHN?"  A: "They're not involved in it."  Q: "So they're not required.  Correct?"  A: "They're not - - I don't know where you're going with this.  You're trying to confuse me with taking sentences out of context." . . . Q: "Is it correct, Mr. Nederlander, that neither of your two sons, Bob, Jr. and Eric, were ever required by Section 7.02(a) to devote their efforts to maximize the economic success of SHN?"  A: "They weren't required to do that.").

7.02(a) of meaningful effect."[104]  The court held that "[w]hile Section 7.02(a) requires the 'Shorenstein Entity' to 'devote their efforts to maximize the economic success of the Company and avoid any conflicts of interest between the Members,' Section 7.06 contains an exception to this broad provision."[105]  The court then held that Section 7.02(b) limited Section 7.06.[106]

We see two problems with the court's interpretation.  *First*, Section 7.06 does not discuss *competition*.  Rather, Section 7.06 provides that:

> SECTION 7.06.  <u>Outside Activities</u>.  *Subject to the other provisions of this ARTICLE VII, including Section 7.02*, any Member, any Affiliate of any Member or any officer or director of the Company shall be entitled to and may *have business interests and engage in business activities in addition to those relating to the Company*, and may engage in the ownership, operation and management of businesses and activities, for its own account and for the account of others, and may (independently or with others, whether presently existing or hereafter created) own interests in the same properties as those in which the Company or the other Members own an interest, without having or incurring any obligation to offer any interest in such properties, businesses or activities to the Company or any other Member, and no other provision of this Agreement shall be deemed to prohibit any such Person from conducting such other businesses and activities. Neither the Company nor any Member shall have any rights in or to any independent ventures of any Member or the income or profits derived therefrom.[107]

This provision speaks to the parties' rights to engage in outside business activities—it says nothing about the right to *compete* against SHN.[108]

---

[104] Opening Br. at 32.

[105] *Declaratory Judgment Opinion*, 2018 WL 3646817, at *24 (footnotes omitted).

[106] *Id.* ("This plain language of the contract, when read through the lens of *generalia specialibus non derogant*, creates a detailed scheme governing competition." (footnotes omitted)).

[107] App. to Opening Br. at A305 (LLC Agreement § 7.06) (emphasis added).

[108] *See Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *8 (Del. Ch. Apr. 3, 2008) ("One plausible definition is that 'competitive' refers to a situation where 'two or

*Second*, and even more problematic, the trial court held that Section 7.02(b), but not Section 7.02(a), limited Section 7.06. In doing so, the court ignored the language stating that Section 7.06 is *subject to* Section 7.02 in its entirety. Section 7.06's "subject to" provision does not exclude Subsection 7.02(a). The plain language reading of Section 7.06 is that individuals and entities bound by the LLC Agreement may engage in business unless that business interferes with the obligations in Section 7.02, including the obligation in Section 7.02(a) to maximize the economic success of SHN and avoid conflicts of interest.

Even so, Section 7.02(a) must still be interpreted in light of Section 7.02(b), which is a more narrowly drafted provision. Usually, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[109] We must therefore consider how those provisions interact and the extent to which Section 7.02(a) is qualified by Section 7.02(b).

One possible reading of Section 7.02(b) is that it qualifies Section 7.02(a) entirely as to competing productions. Under that reading, because Section 7.02(b) only limits controlled productions, it implicitly allows competing productions near San Francisco so long as they are not under the "control" of either entity. If so, the key question in

---

more commercial interests [try] to obtain the *same* business from third parties.'" (quoting BLACK'S LAW DICTIONARY 302 (8th ed. 2004))); *id.* at *8 n.66 (recognizing another plausible definition of "competitive" "as a '[r]ivalry between two or more businesses striving for the same customer or market'" (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 376 (4th ed. 2000))).

[109] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

Nederlander's Section 7.02(a) breach allegation is whether CSH "controls" the productions it stages at the Curran. Nederlander, however, advocates for another reading of Section 7.02(a)—one in which Section 7.02(a) is in harmony with Section 7.02(b), rather than entirely qualified by it.[110] Under that reading, either entity can stage a production it does not control *only* if staging that production would also not undermine the duty to maximize SHN's success. In other words, there is some competition not within Section 7.02(b)'s exceptions that is prohibited by Section 7.02(a).

Section 7.02 is at least arguably ambiguous. The Court of Chancery did not discuss the direct interaction between Sections 7.02(a) and (b), but it did make findings based on the extrinsic evidence that are relevant to the interpretation of Sections 7.02(a) and (b).[111] The trial court found that Walter Shorenstein initiated litigation in the early 1990s because James Nederlander was allegedly competing with their partnership in the areas surrounding San Francisco. The two partners settled that litigation in 1992. As a part of that settlement they included Section 4 of the partnership agreement, which the court found was

---

[110] Oral Argument Video at 5:02–6:18, https://livestream.com/DelawareSupremeCourt/events/8670837/videos/191018409 (Q: "Is there competitive conduct that does not fall within [Section 7.02(b)] that is still prohibited by [Section 7.02(a)]?" A: "Yes. Exactly at the heart of this issue. . . . [T]he meaning of that [Section 7.02(a)], you cannot engage in activity that harms SHN. You must avoid conflicts of interest. That means you can't compete against the business. Competition against the business is antithetical to a duty to maximize. [Section 7.02(b)], therefore—we get to the question of the real heart of it—what does 7.02(b) mean in that construct? The way we look at it, [Section 7.02(b)] is a specific application of the parties' agreement not to compete applying to specific facts that the parties anticipated. Because they had experience with those facts. If you had a controlled production, the parties' agreement was very simple. You cannot put a controlled production within one-hundred miles of San Francisco unless you comply with one of three exceptions.").

[111] *See supra* p. 19–20.

39

"substantially similar" to Section 7.02 and included the duty to "devote their efforts to maximize the economic success of the Partnership and avoid conflicts of interest."[112] The trial court found that limiting competition was "'the most important thing' the agreement was meant to do."[113] Additionally, the historic Curran Theatre was one of three theaters controlled by SHN in San Francisco. These three theaters were close in proximity and were part of the entity's core business.[114]

Those findings, combined with Section 7.02(a)'s plain language that the Shorenstein and Nederlander Entities must devote their efforts to maximizing SHN's economic success, are fundamentally inconsistent with the trial court's conclusion that Sections 7.02(b) and 7.06 generally allow competition that could undermine the economic success of SHN. Although the outer contours of Section 7.02(a)'s requirement that the Shorenstein and Nederlander Entities "devote their efforts to maximize the economic success" of SHN may be unclear, at its essence, Section 7.02(a) establishes a contractual duty to SHN to not engage in competitive activities that would undermine the economic success of SHN, or that would create conflicts of interest between the Members. Thus, CSH cannot itself or through its Affiliates use the Curran to compete with the core business of SHN if such

---

[112] *Declaratory Judgment Opinion*, 2018 WL 3646817, at *26.

[113] *Id.* (quoting Robert's trial testimony).

[114] *See* App. to Opening Br. at A184 (1978 Letter of Understanding) (stating that the "initial purpose" of the partnership was "solely the operation of the Curran.").

competition would not maximize the economic success of SHN, unless the competition involves "controlled productions" falling within one of Section 7.02(b)'s exceptions.[115]

Although we hold that the trial court erred in its interpretation of Section 7.02(a), we decline to order a remand in the Declaratory Judgment Action. Nederlander has not challenged on appeal the trial court's award of nominal damages based on Nederlander's "unified remedy theory."[116] Nederlander does not attempt to explain how damages from a breach of Section 7.02(a), which it interprets to be a contractual duty of loyalty, would differ from the nominal damages the trial court found for the Hayses' breach of the common law fiduciary duty of loyalty. Further, Nederlander has not challenged any other aspect of the court's damages analysis.[117] Nor has it appealed the denial of any other forms of relief.

---

[115] *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del. 1996) (stating that it is a "fundamental proposition that directors may not compete with the corporation" and that doing so violates the duty of loyalty); *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *22 (Del. Ch. Mar. 13, 2000) (holding that a contractual duty of loyalty was necessary to prevent partners from competing in the "very business that is central to [the partnership's] success"), *overruled on other grounds*, *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013). The trial court expressly found that the "Counterclaim defendants admit they are Affiliates of the Shorenstein Entity." *Declaratory Judgment Opinion*, 2018 WL 3646817, at *23 n.263.

[116] *See supra* p.22–23.

[117] Nederlander requested disgorgement of CSH's profits from SHN and mitigation costs. *See* App. to Opening Br. at A830–32 (Nederlander Opening Post-Trial Br.). The trial court noted that those remedies were related to the Curran lease claims, on which the court ruled in favor of CSH and which are not at issue on appeal. *Declaratory Judgment Opinion*, 2018 WL 3646817, at *28, *29 n.320 ("I do not address [Nederlander's] request for disgorgement of corporate distributions, mitigation costs, and specific performance of the Promise or oral lease renewal because I find that no contract or lease renewal exists."). Nederlander has not challenged that finding.

41

As for the PI Action, it is a much closer question as to whether Nederlander fairly presented and preserved its Section 7.02(a) argument. Nederlander quoted Section 7.02(a) in its PI complaint and stated that "the Shorenstein Entity is bound by the provisions of the LLC Agreement," including Section 7.02(a).[118] The complaint further alleges that the Shorenstein Entity breached "the contractual anti-competition" provisions set forth in the LLC Agreement, including Section 7.02(a).[119] The subsequent briefing, however, is largely silent on Section 7.02(a).[120] In addition, Nederlander never directly referenced Section 7.02(a) during oral argument in the PI Action.

Nederlander raises a practical point: Nederlander stated in oral argument on appeal that it did not "focus on" its Section 7.02(a) claim in the PI Action because it would "not [be] very persuasive to say we're going to succeed on the merits on a claim [where the Vice Chancellor] already entered judgment against us" in the Declaratory Judgment Action.[121] Counsel's hesitation to press its Section 7.02(a) argument in the PI Action is perhaps

---

[118] App. to CSH Answering Br. at B467–68, B471 (PI Complaint).

[119] *Id.* at B484 ("By permitting, authorizing, working in furtherance of and/or contracting to stage productions at the Curran over which they exercise control – including without limitation *Dear Evan Hansen* and *Harry Potter* – without first satisfying one of the three exceptions set forth in Section 7.02(b), CSH, CSH Curran, CSH Productions, Curran Live, Carole Shorenstein Hays, Jeff Hays, and Thomas Hart breached the contractual anti-competition provisions set forth in Sections 7.02(a), 7.02(b), and 7.06 of the LLC Agreement and the related, implied covenant of good faith and fair dealing.").

[120] *See* App. to Opening Br. at A1094 (Nederlander Opening PI Br.) (stating that Sections 7.02(b) and 7.03 "are consistent with Section 7.02(a), which requires the Shorenstein Entity to 'devote their efforts to maximize the economic success' of SHN, avoid conflicts, and act in good faith"); *id.* at A1222 (Nederlander Reply PI Br.) (stating, in a footnote, that "SHN and NSF reserve their rights to enforce Defendants' conduct that violates Section 7.02(a) of the LLC Agreement").

[121] Oral Argument Video at 6:50–7:25, https://livestream.com/DelawareSupremeCourt/events/8670837/videos/191018409.

understandable. But Nederlander's delay in challenging that ruling is less understandable if it intended to press its Section 7.02(a) theory in the PI Action. For example, Nederlander chose not to move for re-argument of its Section 7.02(a) argument in the Declaratory Judgment Action—even though it sought clarification of other issues in that action. And it did not promptly appeal the Declaratory Judgment Opinion to seek a review of its Section 7.02(a) claim of error. Instead, Nederlander took the full thirty days to file an appeal. Further, Nederlander filed a new action challenging *Dear Evan Hansen* and *Harry Potter* that focused on Section 7.02(b), and only stated in a footnote to its reply brief in the PI Action that "SHN and NSF reserve their rights to enforce Defendants' conduct that violates Section 7.02(a)."[122]

Given those facts and Nederlander's request (made only in the PI Action) that this Court issue an expedited decision before July 1, 2019, we are tempted to deny Nederlander an opportunity to press its Section 7.02(a) theory on remand in the PI Action as to *Dear Evan Hansen* and *Harry Potter*.[123] However, given the complicated procedural posture and timing of events in the two related cases, and the fact that the trial court entered partial final judgment only upon Count I of Nederlander's complaint in the PI Action,[124] we reject the Hayses' claim that Nederlander has completely waived Section 7.02(a), and we order

---

[122] App. to Opening Br. at A1222 (Nederlander Reply PI Br.).

[123] Mot. to Expedite at 6. Nederlander explained that the showing of *Harry Potter* also requires that the Curran undergo extensive modifications to alter the appearance and structure of the theater, which are set to begin as early as July 1, 2019. *Id.*

[124] *Nederlander of San Francisco Assocs. v. CSH Theatres LLC*, 2018 WL 6790280, at *1 (Del. Ch. Dec. 21, 2018) [hereinafter *PI Action Rule 54(b) Order*].

a remand in the PI Action so that the impact of this court's reversal of the Section 7.02(a) ruling in the Declaratory Judgment Action may be considered. As to its other claims in the PI Action, Nederlander only tangentially mentioned them in a footnote of its opening brief in that action,[125] and, thus, the trial court declined to rule on them.[126] Although it appears to us that the trial court concluded that those claims had been abandoned for all purposes, because we remand the PI Action, we ask the trial court to determine whether any of those claims, and which remedies, if pressed by Nederlander, remain viable.

We remind the parties that the trial court has wide discretion to appropriately narrow proceedings on remand, particularly given the extensive proceedings that have already taken place. And more specifically, given Nederlander's apparent choice to defer any

---

[125] App. to Opening Br. at A1100 (Nederlander Opening PI Br.) ("NSF has also brought claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty. There is also a reasonable probability of success on those two claims. CSH is a member and 50% owner of SHN. Given its significant control over SHN and various terms in the LLC Agreement, CSH owes common law and contractual fiduciary duties. As such, the individual defendants who ultimately control CSH likewise owe fiduciary duties. Moreover, Delaware law recognizes a claim for aiding and abetting breach of fiduciary duty, including contractually created fiduciary duties. Here, CSH owed and breached contractual and common law fiduciary duties. Even if the other Defendants did not breach duties they owed directly, they knowingly participated in CSH's breaches by causing or participating in the transactions that violated those duties. Accordingly, they are liable as aiders and abetters." (internal citations omitted)).

[126] *PI Decision*, 2018 WL 6271655, at *11 ("Nederlander raises in a footnote [of its opening brief in the PI Action] that it has brought claims for breach of fiduciary duty and aiding and abetting and that these have a 'reasonable probability of success' because CSH is a member and fifty percent owner of SHN, leading to 'common law and contractual fiduciary duties.' . . . [Nederlander] addresses the issue so summarily in its footnote that it lends no assistance to its argument about reasonable probability of success on the merits. [Nederlander] does not mention the issue at all in its sections on Irreparable Harm or Balance of the Equities. Finally, because [CSH and its Affiliates] objected to the issue as not properly raised, and because [Nederlander] did not respond to that objection either in its Reply Brief or at Oral Argument, it appears that [Nederlander] has abandoned this argument. Thus, I decline to rule on the fiduciary duty claim."). Nederlander has not challenged this holding on appeal.

challenge to the Section 7.02(a) ruling until *after* obtaining the ruling in the PI Action, we think, absent new and compelling factual developments, that the trial court would be well within its discretion to deny any renewed request for expedited preliminary injunction proceedings as to the two productions at issue in the PI Action.[127]

C.      *We Find No Error in the Court of Chancery's Interpretation and Application of Section 7.03 in the PI Action*

Nederlander contends on appeal that the Court of Chancery erred in its interpretation and application of "control," as defined in Section 7.03, as to *Dear Evan Hansen* and *Harry Potter* in the PI Action.[128]   Specifically, Nederlander claims that the trial court "misunderstood" and "consequently mischaracterized" its argument to mean that the Hayses control any production that they stage at the Curran, and that it therefore "never considered the facts supporting [its] claim or the merits of the claim."[129]   We reject Nederlander's claim of error for two reasons.  *First,* the trial court did not "misunderstand" or "mischaracterize" Nederlander's arguments.  Rather, it addressed the very arguments

---

[127] Nederlander's decision to not seek immediate re-argument or immediate appellate review of the trial court's interpretation of Section 7.02(a) in the Declaratory Judgment Action likely provides a sufficient basis to reject any request by Nederlander for a second bite at expedited preliminary injunction proceedings in the PI Action as to the two challenged productions. Additionally, we note that the Hayses opposed Nederlander's request for expedition of the PI Appeal, pointing out that CSH was "set to turn over the Curran to a third-party tenant pursuant to a lease beginning on July 1, 2019, and the producers of *Harry Potter* have announced that the show will not open until sometime in the fall of 2019."  Opposition to Mot. to Expedite ¶ 7.

[128] Section 7.03 defines "control" as "having the ability to determine where the Production plays and the terms and conditions of said engagement."  App. to Opening Br. at A305 (LLC Agreement § 7.03).

[129] Opening Br. at 37, 40.

that Nederlander presented. *Second*, the trial court actually did consider the relevant facts and the merits of Nederlander's control arguments.

As to the first issue, Nederlander argues that the trial court erred by interpreting its argument to mean that the Hayses "control every play that is staged (*i.e.* presented) at the Curran if they engage in the 'making of the agreement' or if they retain any influence over programming," and thus, "in essence, [Nederlander] argues that [the Hayses] control any production that they stage."[130] Instead, Nederlander claims to have argued that, between the two extremes of passive ownership of a theater and total control of both the production and theater,[131] there "lies a broad middle space where the issue of control over production becomes highly fact-dependent," and that "the specific rights the Hayses had obtained for

---

[130] *PI Decision*, 2018 WL 6271655, at *8.

[131] Nederlander describes that spectrum of control as follows:

> On one end of the spectrum, the theater owner may contract away all control over the operations of the theater, giving a third party complete freedom to operate and stage productions with no involvement from the theater owner. This paradigm includes the "long-term, passive lease" that described the terms of SHN's lease of the Curran from the Lurie family. On the opposite end of the spectrum, the theater owner maintains complete control over all theater operations, including the right to operate the theater to stage all productions that the owner itself produces. Under the former paradigm arrangement, the owner has no control over any production staged at the theater, because the owner has contracted away any right to determine where that production plays or any terms and conditions of the production. Under the latter paradigm arrangement, the theater owner has complete control over every production staged at the theater. That is because the owner, as the theater owner, wearing its hat as the proprietor, operator and producer, would incontestably have the ability to determine where each production plays and its terms and conditions

Opening Br. at 38–39.

themselves in connection with staging DEH and Harry Potter were sufficient to give the Hayses *joint control* over those productions."[132]

But on the question of what constitutes "joint control," Nederlander argued below that "[p]roducers and theater operators *jointly* determine the location and terms" and that it is merely "the *making of an agreement* between a theater operator and producer that provides them *both* with control over the engagement."[133] Nederlander also argued: "It is undisputed that theater operators and producers jointly control the terms of the engagement. Even where a producer has substantial leverage, the theater operator remains free to accept, reject, or attempt to negotiate the terms of the engagement."[134] As to what kind of staging at the Curran would *not* result in joint control, Nederlander offered the long-term Lurie lease as an example:

> [The Hayses] argue that NSF's interpretation makes the phrase "control over production" meaningless because NSF's interpretation encompasses every show that will play at the Curran. [The Hayses] are wrong. As the Court is aware, the Curran was leased for decades by the Luries to SHN. The Luries owned the [Curran], but they did *not* control any production that played at the theater because they (unlike [the Hayses]) agreed to a lease that ceded control over particular shows and their terms to SHN.[135]

From those statements, the trial court interpreted Nederlander's argument to mean that control "exist[s] under the LLC Agreement anytime Defendants 'stage' (*i.e.*, present) a show directly (rather than through a passive lease with another party controlling all

---

[132] *Id.* at 39, 41 (emphasis added).

[133] App. to Opening Br. at A1224 (Nederlander PI Reply Br.) (emphasis added).

[134] *Id.* at A1225 (citations omitted).

[135] *Id.* (citations omitted).

47

programming such as the choice of production, pricing, marketing, etc.).”[136] We hold that this was a reasonable interpretation of Nederlander's position, and we find no error with the trial court's analysis of those arguments.

As to the second issue, the Court of Chancery fully considered the merits of Nederlander's argument. In doing so, it cited the relevant facts and distinguished them from its interpretation and application of Section 7.03 to *Fun Home* in the Declaratory Judgment Action—a ruling and analysis that Nederlander has not contested.[137] In fact, Nederlander, in its opening brief on appeal, affirmatively states that it “agrees with the trial court's interpretation of 'control over the production' in the” Declaratory Judgment Action, and that “the court properly concluded that the Hayses had 'control' over Fun Home.”[138] Regarding *Dear Evan Hansen*, the court recognized Nederlander's argument that the Hayses controlled “[t]he financial terms, the number of performances, the dates, the duration of the show,” “[t]icketing fees, for example, facility fees,” “[s]eat sales, sale dates,

---

[136] *PI Decision*, 2018 WL 6271655, at *10; *see also id.* (“[Nederlander] argues that this control can occur at any time prior to the staging of the show, whether two years before staging the show (based on something like the right of first refusal in *Fun Home*) or two days before the staging of the show (based on a contract allowing the production to play). Therefore, [Nederlander] argues, the control over the productions of *DEH* and *Harry Potter* that Defendants gained through the contracts they signed booking those productions to play at the Curran is sufficient to make the productions subject to Defendants' 'control' as defined in Section 7.03. *This, [Nederlander] explains, is because Defendants were involved in negotiating the terms and could have rejected them at any time, preventing* DEH *and* Harry Potter *from playing at the Curran.*” (emphasis added) (citations omitted)).

[137] *Id.* at *9 (“I must now evaluate [Nederlander's] contention that the circumstances surrounding the production of *DEH* and *Harry Potter* evidence control—the ability to determine where to produce the plays and the terms and conditions of said engagement.”).

[138] Opening Br. at 37.

[and] the dynamic pricing arrangement."[139] Similarly, as to *Harry Potter*, the court cited Nederlander's arguments that the Hayses had "control over terms and conditions," including "that [Carole] had to approve the manager of [the] operation . . . [and got] priority seating requirements for subscribers," and that she "had final say over physical renovations to the [Curran]."[140]

But the trial court noted that, unlike in *Fun Home*, "the Defendants had no independent right or authority to cause *DEH* or *Harry Potter* to play at the Curran or to set the terms for either play," and that "*DEH* or *Harry Potter* could have chosen to play at an SHN theater without breaching any obligation to any of the Defendants."[141] The terms that the Hayses and the producers did agree upon were the "product of negotiations that occurred simply because Hays's affiliate owns the Curran and she had the ability to say no to a request to use the Curran on terms that she did not find agreeable."[142] Additionally, the trial court expressly found that the producers of *Dear Evan Hansen* and *Harry Potter* "openly negotiated with multiple venues" in San Francisco, and that "the parties engaged in an open competition to show both *DEH* and *Harry Potter*."[143] Thus, the court concluded, "the facts of *Fun Home* do not apply."[144]

---

[139] *PI Decision*, 2018 WL 6271655, at *9 (internal quotations omitted).

[140] *Id.* (internal quotations omitted).

[141] *Id.* at *9, *11.

[142] *Id.* at *9.

[143] *Id.* at *11.

[144] *Id.*

Based on those factual findings—which Nederlander did not challenge below and has not challenged on appeal—the court held that Nederlander had "failed to show a likelihood of success on the merits"[145] and entered final judgment as to Nederlander's alleged breach of Section 7.02(b) pursuant to Court of Chancery Rule 54(b).[146] We agree with the Court of Chancery's analysis and affirm that aspect of the PI Decision.

## VII. Conclusion

For the foregoing reasons, we AFFIRM in part, and REVERSE in part, the Court of Chancery's July 31, 2018 opinion, and we AFFIRM in part, REVERSE in part, and REMAND the Court of Chancery's November 30, 2018 opinion for further proceedings consistent with this Opinion. This Court expects the parties to work together in a cooperative manner in the proceedings on remand so that any remaining issues can be appropriately narrowed and resolved by the trial court in an efficient manner.

---

[145] *Id.*

[146] *PI Action Rule 54(b) Order*, 2018 WL 6790280, at *1.

*Addendum*

Finally, we comment on one last point that was addressed by the trial court, but is not an issue raised by the parties on appeal, namely, the deposition misconduct by Carole Shorenstein Hays.[147]  In *Paramount Communications Inc. v. QVC Network Inc.*,[148] this Court addressed, in an Addendum, deposition misconduct by a *lawyer* at a deposition.  This Addendum addresses a less frequently discussed corollary concerning the duty of counsel who is faced with a *deponent's* inappropriate conduct at a deposition.

In *Paramount*, the Supreme Court, *sua sponte*, addressed misconduct by out-of-state counsel who was representing a director of Paramount Communications in a deposition. That attorney was barred in Texas, was not admitted *pro hac vice*, and did not otherwise appear in the Delaware proceeding representing any party.  No member of the Delaware bar was present at the deposition representing any of the defendants or the stockholder plaintiffs.

After examining the deposition transcript, the Supreme Court held that the attorney had abused the privilege of representing a witness in a Delaware proceeding by: (a) improperly directing the witness not to answer certain questions; (b) being extraordinarily

---

[147] We comment on this matter "under our 'exclusive supervisory responsibility to regulate and enforce appropriate conduct of . . . all lawyers, litigants, witnesses, and others' participating in a Delaware proceeding." *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 507 (Del. 2005) (quoting *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994)).

[148] 637 A.2d 34 (Del. 1994).

rude, uncivil, and vulgar; and (c) obstructing the ability of the questioner to elicit testimony to assist the court in the pending matter.[149]

The Supreme Court found the unprofessional behavior to be "outrageous and unacceptable."[150] After quoting portions of the deposition transcript, we stated:

> As noted, this was a deposition of Paramount through one of its directors. Mr. Liedtke was a Paramount witness in every respect. He was not there either as an individual defendant or as a third party witness. Pursuant to Ch. Ct. R. 170(d), the Paramount defendants should have been represented at the deposition by a Delaware lawyer or a lawyer admitted *pro hac vice*. A Delaware lawyer who moves the admission *pro hac vice* of an out-of-state lawyer is not relieved of responsibility, is required to appear at all court proceedings (except depositions when a lawyer admitted *pro hac vice* is present), shall certify that the lawyer appearing *pro hac vice* is reputable and competent, and that the Delaware lawyer is in a position to recommend the out-of-state lawyer. Thus, one of the principal purposes of the *pro hac vice* rules is to assure that, if a Delaware lawyer is not to be present at a deposition, the lawyer admitted *pro hac vice* will be there. As such, he is an officer of the Delaware Court, subject to control of the Court to ensure the integrity of the proceeding.[151]

This Court stated that counsel attending the deposition on behalf of the Paramount defendants had an obligation to ensure the integrity of the proceeding. We stated further that a Delaware lawyer, or a lawyer admitted *pro hac vice*, would have been expected to put an end to the misconduct in the deposition.[152] As in *Paramount*, although this Addendum has no bearing on the outcome of the case, we are compelled to address Hays's misconduct and the role of her counsel when faced with such a situation.

---

[149] *Id.* at 53.

[150] *Id.* at 55.

[151] *Id.* at 55–56.

[152] *Id.* at 56.

The following are excerpts of her deposition testimony. Most of these excerpts were reprinted at the end of the Court of Chancery's Declaratory Judgment Opinion and formed the basis for the trial court's award attorneys' fees and costs:[153]

Q. Have you ever been deposed before?

A. *Yes.*

Q. How many times?

A. *Once.*

Q. When?

A. *I believe it was a while ago.*

Q. What was the matter about?

A. *It was a difference of opinions.*

Q. I'm sorry, go ahead. Were you done with your answer?

A. *Yes.*

Q. A difference of opinion about what?

A. *How best to proceed in one's lives.*

Q. Was it involving a lawsuit?

A. *Oh, definitely.*[154]

. . . .

Q. Did you ever meet with your counsel in advance of this deposition?

A. *Oh, absolutely.*

---

[153] The citations within the excerpts quoted above are to the pages of Hays's deposition transcript [hereinafter "Hays Dep."].

[154] Hays Dep. 6:23–7:16.

Q. How much time did you spend with your counsel to prepare for the deposition?

A. *Sufficient.*

Q. How much is sufficient?

A. *The appropriate amount needed.*

Q. Can you give me an estimate of the amount of time?

A. *It was completely enjoyable.*

Q. How many times did you meet with your counsel to prepare for the deposition?

A. *Preparation is always a good thing.*

Q. That wasn't my question. How many times did you meet with your counsel to prepare for the deposition?

A. *I met with them – I'm not understanding the question.*

Q. You told me you met with your counsel to prepare for the deposition.

A. *Sure.*

Q. How many times?

A. *Well, see, I think of time as a continuum. So I think I met with them from the beginning to the end. And the beginning was the start, and then there was the rehearsal, and then there was the preview, and now it's what I think of as the performance. So, in my mind, I'm answering what you're asking. If you could be more specific. Do you want hours?*

Q. Yes.

A. *Oh, I don't wear a watch. So I know the sun coming up in the morning and the moon coming up at night.*

Q. Can you tell me the number of times that you met with your counsel to prepare for the deposition? I'm looking for a number.

A. *Well, I gave you that.*

Q. What was the number?

A. *The number was the beginning to the end.*

Q. How many times?

A. *You know, I think – I don't recall.*

Q: Did you review any documents to prepare for the deposition?

A. *Oh, certainly.*

Q. What documents did you review?

A. *The ones that were put in front of me.*

Q. What were they?

A. *Documents.*

Q. Can you recall any of them?

A. *Yes.*

Q. Tell me which ones.

A. *Many.*

Q. Great. Tell me.

A. *Many, many, many.*

Q. Tell me about them.

A. *Well, they were full of words and communications and –*

Q. Can you identify any of them by date or what type of document it is, or who the sender or recipient was?

A. *No.*[155]

. . . .

---

[155] *Id.* at 11:19–14:16.

Q. Did you go to college?

A. *Well, yes.*

Q. Where?

A. *I mean tuition was paid.*

Q. Where did you go?

A. *Oh, I had books from a lot of different places.*

Q. Did you enroll at any of those places?

A. *Oh, sure.*

Q. Where did you enroll?

A. *Many, many universities – not that many – a few.*

Q. So you enrolled in a few universities?

A. *Throughout my years, sure.*

Q. Which universities?

A. *Well, one was here, NYU.*

Q. Any others?

A. *Stanford. I don't recall.*

Q. Did you graduate from NYU?

A. *No.*

Q. Did you –

A. *Well, maybe. It's unclear.*

Q. You're not sure?

A. *You mean do I have a diploma? No. Did I receive enough credits to graduate, is that your question?*

Q. That's a question, that's fine.

A. *Is that your question?*

Q. Sure.

A. *You know, it's been said that I have –*

Q. It's been said that you have what? That you have graduated?

A. *It's been said that.*

Q. Do you have a degree from NYU?

A. *Do I have something like a piece of parchment?*

Q. No. Did you finish the requirements –

A. *Did I receive –*

Q. If you could wait until I finish my question.

A. *Sorry.*

Q. Did you complete the coursework and earn enough degrees [sic] to earn a degree? I don't care if you have a piece of paper on your wall. I want to know, did you earn a degree?

A. *I don't recall.*

Q. You don't recall whether you have a degree from NYU?

A. *Correct.*[156]

. . . .

Q. When did you attend NYU?

A. *Oh, goodness. You see, definitely, definitely in my youth.*

Q. Can you be more specific?

A. *No.*

Q. For how many years did you attend NYU?

---

[156] *Id.* at 15:21–18:2.

A. *Again, time is a compendium. So I was there a while.*

Q. Can you be more specific?

A. *No.*

Q. Since you completed your studies at NYU, have you had employment anywhere?

A. *How do you define "employment"?*

Q. You've never used the word employment in your life?

A. *I'm just wondering how you define it.*

Q. Have you used the word employment in your life, ever?

A. *I'm asking you.*

Q. You don't get to ask the questions. I get to ask the questions.

A. *Oh, sorry.*

Q. Have you ever used the word employment in your life?

A. *I've used many words.*

Q. Have you used the word employment in your life?

A. *It's a word I'm familiar with.*

Q. What is your understanding of the word employment?

A. *Well, I think it has to do with – I'm not sure.*

Q. You're not sure what the word employment means?

A. *Yeah.*

Q. Have you ever worked for any kind of company or somebody who might be referred to as an employer?

A. *Possibly.*

Q. You're not sure?

A. *I would say sure.*

Q. Who have you worked for? And if you could give this to me in chronological order.

A. *Oh, that's – I could give it to you as best I could.*

Q. Sure.

A. *Okay. So I've worked – just in terms of work or in terms of remuneration?*

Q. Work.

A. *So you – well, I've worked on political campaigns.*

Q. And you consider those political campaigns to be your employer?

A. *Well, I – I considered it to be work. That to me was the question posed to me.*

Q. Let's see if we can start again.

A. *Okay.*

Q. I'm looking for your employment history. This isn't a trick question. Are you able to give me your employment history?

A. *I don't know.*

Q. Have you ever worked at SHN?

A. *I have a deep association with it, yes.*

Q. When you say "a deep association," have you ever worked at SHN?

A. *That's my answer.*

Q. Yes or no, have you worked at SHN? I don't understand your answer.

A. *I answered the question.*

Q. I don't understand your answer. Can you please answer it again?

A. *I'm comfortable with my answer.*

Q. Okay. So you're unwilling to tell me whether you've ever worked at SHN?

A. *My answer reflects the question posed to me.*

59

Q. I don't even know what that means. My question is, have you ever worked at SHN, yes or no?

A. *I find my answer to be most inclusive.*

Q. I don't understand what that --

A. *And embracing.*[157]

. . . .

Q. Have you ever been arrested?

A. *I don't recall.*

Q. You might have been arrested and you just don't remember?

A. *I've led a long life, very colored.*

Q. Sitting here today, can you tell me whether any of that color involved being arrested?

A. *I don't recall.*

Q. Do you know what SHN is?

A. *They're letters in the alphabet.*

Q. Do you know of a company that goes by SHN?

A. *I certainly have a deep, deep association with it.*

Q. What is SHN, beyond letters in the alphabet? I'm referring to the company.

A. *It's a company – it's a company.*

Q. Is it in the theatre business?

A. *It's a company that has people associated with it.*

Q. Is it in the theatre business?

A. *How do you define "theatre"?*

---

[157] *Id.* at 18:9–22:3.

Q. I just want to make clear, I'm asking you if SHN is in the theatre business, and you can't answer that question without further explanation?

A. *Can you ask the question again?*

Q. Sure. Is SHN in the theatre business?

A. *There's many different types of theatres. Are we today in the theatre business? This is perhaps a piece of theatre that's being recorded. So I think, again, I need more context.*[158]

. . . .

Q. When was SHN founded?

A. *At the beginning.*

Q. In what year?

A. *The year it was founded.*

Q. Can you give me a year?

A. *No.*

Q. Who founded it?

A. *I was there.*

Q. What do you mean when you say you were there?

A. *I was there at the very beginning when it was – at the very day one.*

Q. Does that make you a founder?

A. *Does giving birth to a child make you a mother?*

Q. Yes, but that wasn't my question. My question was, the fact that you were there, does that make you a founder?

A. *I believe it's semantics.*

Q. Yeah, well, we're here today about semantics and words matter.

---

[158] *Id.* at 23:7–24:19.

A. *Sure.*

Q. So my question is, was your father a founder of SHN?

A. *My – I am the daughter of my father.*

Q. By definition, you are the daughter of your father. My question was, is your father a founder of SHN?

A. *My father and my mother raised me in an environment to have a great love and appreciation of the arts and introduced me to many, many people.*

Q. My question was, is your father a founder of SHN?

A. *That wasn't close, that wasn't close, the answer?*

Q. No.

A. *No?*

Q. No.

A. *Tell me again, was my father –*

Q. Was your father, Walter Shorenstein, a founder of SHN?

A. *He certainly cleared a path for me, and I can't – I don't know what that word means.*

Q. You don't know what the word founder means?

A. *No.*[159]

. . . .

Q. No, my question is specific to this meeting. Did you say during this meeting that you were unappreciated?

A. *Well, I think when you ask for a thank you and you don't get a thank you – so under-appreciated is so . . .*

Q. Mrs. Hays, my question isn't about what the word means. My question is, at this meeting, did you –

---

[159] *Id.* at 24:24–27:2.

A. *You're getting yourself agitated.*

Q. Did you say the words – and please stop commenting on me – did you say the words I'm unappreciated or underappreciated? That's my question. Did you say I'm unappreciated, I'm not getting enough appreciation? Did you say something like that?

A. *You're smiling, so I'll answer it. Sure, I did.*[160]

. . . .

Q. Then you write: "Feeling duped by the Stuart Thompsons." Who is Stuart Thompson?

A. *A person who works in the business.*

Q. What does he do?

A. *He's a general manager and producer.*

Q. Of what shows?

A. *Many shows.*

Q. Can you give me his most successful shows?

A. *No.*

Q. Can you give me any of the shows?

A. *I don't recall.*

Q. You don't recall any shows that Mr. Thompson has produced? Is that a no? You were shaking your head.

A. *I don't recall.*

Q. Okay. Had you been duped by Stuart Thompson?

A. *I don't recall.*

Q. It refers to Oskars, O-S-K-A-R-S. What is that a reference to?

A. *I don't recall.*

---

[160] *Id.* at 157:20–158:14.

Q. And feeling I was just a slob with Felix. Who is Felix?

A. *I don't recall.*

Q. You understand you're under oath, right?

A. *I recall.*

Q. You recall that you're under oath?

A. *I recall.*

Q. And you're going to tell me you don't know – you can't tell me a single show that Stuart Thompson has produced?

A. *Something I'm sure would be in the deep recesses of my mind. Should we sit and tell – would that be a value to why we're here? Would you like me to do that? Because I can.*[161]

. . . .

Q. Why did you write "Yipppppe de da"?

A. *I like using that word.*

Q. What meaning were you trying to convey?

A. *Yipppppe de da, doo da, you know, a jazz term.*

Q. And what does that mean when it's used in an e-mail like this?

A. *Different beats along the way.*

Q. That's what you meant to convey –

A. *Trumpets, yeah.*

Q. You meant to convey to your husband trumpets?

A. *Sure.*

Q. And what was the significance of trumpets?

A. *Good tone.*

---

[161] *Id.* at 282:21–284:16.

Q. What does it have to do with Bullets over Broadway?

A. *Bullets over Broadway is very, very interesting, because you know what, I was wrong. So when I said more often than not I'm right, here is an example where I'm wrong. It closed on Broadway and lost its 12 to $15 million investment. So I think the Nederlanders should be more than elated that I'm not part of their esteemed venerable organization of picking hits, because had I done it, whoa, Yipppppe de da.*[162]

. . . .

Q. And is it right that the plan is for the season to include Broadway-style shows?

A. *Those were her words. This was a proposal.*

Q. Was that – I'm sorry?

A. *This was a proposal.*

Q. Was that your plan, to show Broadway-style shows?

A. *I'm always open to ideas.*

Q. Is Fun Home a Broadway-style show?

A. *I'm always open to ideas, and I'm always open to great art, and I'm always open to great artists, and I always work in a way when the art is first – when it's not evident. So I maintain that what I personally do or what one does in life is with the artist, and whether it's within 10 blocks in New York City, or downtown, or in Berlin, or London, as long as what I, Carole Shorenstein Hays, do, is immaterial to any of this.*[163]

. . . .

Q. After that conversation before it opened, have you ever discussed with anyone the idea of bringing Hamilton to the Curran Theatre?

A. *You know, I would love everything that I love to be at the Curran. So would I have loved Hamilton to be at the Curran, you betcha.*

---

[162] *Id.* at 310:13–311:21.

[163] *Id.* at 328:2–25.

Q. Did you talk to anyone about it?

A. *I talked to the butcher, the baker, the candlestick maker.*

Q. But did you talk to the people who have any connection with Hamilton?

A. *I talk. I talk. You know, I talk. Hamilton went where it went. So I think that I am doing right by me and SHN is doing right by them. And this idea of scorched earth and I'm not allowed to talk to certain people is really kind of un-American.*[164]

. . . .

Q. What other plays that we haven't discussed have you tried to bring to the Curran?

A. *I'm always in conversation and none – and I stand by what I say, that I wish everyone, everyone well and my success is no reflection on SHN's [success or] failure. They truly maintain that I had nothing whatsoever to do with this business. So why are you so focused on who I am? I just find it really fascinating that on the one hand I know nothing, but on the other hand everything I know is stolen, perched, poached. So I think you better really think about the questions in a crisper way.*[165]

. . . .

Q. And tell me about the shows that, are there any shows that you're in discussions with now that have not yet been announced?

A. *For?*

Q. The Curran. And again, we can limit this to Broadway.

A. *That will be announced at –you know, it's all subjection, isn't it? Because these are shows, and this is what I do and have always done with my own personal money, I invest in artists, I nurture them. They come to Broadway, they work, they go over places. It's interesting how you just said Broadway. See, it's such a Nederlander thing, because I am like in Brooklyn, downtown, and you don't ask me about that. You wouldn't ask me about Hamilton if when I had the conversation with Oskar Eustis – so it's a very Nederlander*

---

[164] *Id.* at 357:15–358:10.

[165] *Id.* at 360:9–25.

*mindset that suddenly what is on Broadway is their fiefdom – and I say, whoa, wait a second, bring it on then, you guys tell me because, you know what –*

Q. Mrs. Hays, I'm just trying to get a list. I started with Broadway because you told me earlier my question was too broad. I know that Fun Home is playing. I know Eclipsed is playing. We've talked about a number of other shows. Are there other Broadway-style shows that you have had conversations with people about bringing them to the Curran?

A. *I always have conversations –*

Q. What shows?

A. *– with people. There are numerous shows.*

Q. Tell me.

A. *I don't want to. I don't think it's any of your business whatsoever. I am pleased to answer the question. I am not hiding information. But it's my own money. I'm like free and clear. Why do I have to keep answering when I've just simply tried to get from Bob Nederlander who is behind him, who the successors are, and suddenly you have the right, the glee, the kaboom to ask me to go is that your personal e-mail – yes, we're going to emotionally water board you, we're going to keep you down as far as you can go, as though that's like what we do under the name of the law that's what you went to law school for and that you will go home and tell your wife you had a great day – that's what we're doing?*

*I'm just simply trying to do my life at the Curran, and to do community programs. Let's talk about that. Let's talk about things that I wanted to do at SHN that I couldn't, because they weren't interested in.*

*I will be having – the reason I'm doing Eclipsed is because it has, it is about the Liberian kidnapped girls. Do you know about that? I'm sure you've heard about that. This is a show that no one would bring to Broadway except someone like me who believed in it, and it's a show that my son has really picked up, and it's about art and activism, and we at the Curran, we at the Curran are going to open our doors to bring in school kids to see shows maybe for the first time, to see, to do that.*

*That's what I want to do, and that's what I want to talk about. And you want to just take my, me and my and just keep bashing it against the wall, and I'm happy to stay until the lights come up and the lights go down. Don't bother me at all. Because I've been doing this 30 years. And you know what, I'm*

*like Judy Garland, I can keep, keep, keep, – I got another song in me, and I know when I walk throughout the community, they're thrilled of what I'm doing.*

*It's – they don't look at me as being combative. They're thrilled I have a love of the Curran. I've never – I've never and I've always said to Bob Nederlander and to Greg Holland and to everyone else, this is a wonderful, wonderful, wonderful, business.*[166]

This is a representative but incomplete identification of Hays's ridiculous and problematic responses to questions. It appears from the cover page of the deposition transcript that the only Delaware lawyer present was an attorney representing the nominal defendant, SHN.[167] Two attorneys appeared at the deposition on behalf of Hays, including Brian T. Frawley, a partner with Sullivan & Cromwell LLP, and an associate from that firm.[168] They were both admitted *pro hac vice* in the Court of Chancery proceedings. Frawley took the lead in defending Hays's deposition. From our reading of the record (the transcript), it appears that Frawley made no attempt to put an end to Hays's flagrantly evasive, nonresponsive, and flippant answers. In fact, at one point, the examiner implored Frawley to control his own client but was rebuffed:

MR. DOLUISIO: I just want to know for the record, Mr. Frawley, I don't want this deposition to go multiple days. It will. I'm getting non-responsive answers and now I'm getting speeches. I'm trying not to be rude. I think you recognize what I'm going through here.

MR. FRAWLEY: I think you frankly deserve that one, but we'll go on.

MR. DOLUISIO: I asked her where she was employed.

---

[166] *Id.* at 364:8–368:6.

[167] App. to Nederlander Reply Br. at AR002 (Hays Dep. Tr.).

[168] *Id.*

MR. FRAWLEY:  That's not really what you asked her.  But are you done, Carole.

THE WITNESS:  Uh-huh.[169]

The trial court appropriately awarded attorneys' fees and costs for Hays's willful bad faith litigation tactics.  The deposition appears to have been a colossal waste of time and resources due to her behavior, which made a mockery of the entire deposition proceeding.  Although this award of fees and costs is not challenged on appeal, we write to remind counsel that they have a responsibility to intercede and not sit idly by as their client engages in abusive deposition misconduct.[170]

Depositions are court proceedings, and counsel defending the deposition have an obligation to prevent their deponent from impeding or frustrating a fair examination.  Although counsel can be caught off guard by a client's unexpected, sanctionable outburst, that is not what happened here.  Rather, Hays's flippant, evasive, ridiculous answers and

---

[169] Hays Dep. 57:12–58:3.  Hays's appellate counsel did not help matters during oral argument before this Court when he was questioned about his client's deposition behavior.  Aside from repeatedly interrupting the Court and talking over the Court when the Court was raising the matter near the end of counsel's allotted time for oral argument, counsel for Hays failed to acknowledge the inappropriateness of Hays's conduct and then even tried to make an excuse for her by simply— and incorrectly—telling the Court that this was Hays's first deposition.  *See* Oral Argument at 38:06–39:40, https://livestream.com/accounts/5969852/events/8670837/videos/191018409 /player 39:30; *see also* Hays Dep. 6:23–25 (Q.  "Have you ever been deposed before?"  A.  "Yes.").

[170] *See Kaung*, 884 A.2d at 508 (holding that deposition misconduct can be "just as outrageous and unacceptable when accomplished by a non-lawyer consultant or a witness at a deposition," and stating that "[f]or future guidance and deterrence, we emphasize that sanctions may be imposed upon anyone participating in a Delaware proceeding who engages in abusive litigation tactics"); *see also GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 194–95 (E.D. Pa. 2008) (sanctioning both the deponent and counsel for extremely abusive, obstructive and vulgar deposition conduct of the client, and where client's counsel "persistently failed to intercede" and "sat idly by as a mere spectator to [the client's] abusive, obstructive, and evasive behavior").

69

speech-making continued throughout the entirety of the deposition, which began at 9:38 a.m. and concluded at 7:13 p.m. An attorney representing a client who engages in such behavior during the course of a deposition cannot simply be a spectator and do nothing.[171] Here, Hays's counsel made no apparent effort to curb her misconduct.

Delaware counsel moving the admission of out of state counsel *pro hac vice* also bear responsibility in such a situation. They must ensure that the attorney being admitted reviews the Principles of Professionalism for Delaware Lawyers, but they must also ensure that the out-of-state counsel understands what is expected of them in managing deposition proceedings outside the courthouse so that the litigation process is not abused.[172] Such

---

[171] We recognize that conferences between the attorney and deponent during the deposition should not occur except to "assert a privilege against testifying or on how to comply with a court order." Ct. Ch. R. 30(d)(1). Parties may also make a motion "upon a showing that the examination is being conducted or defended in bad faith or in such manner as unreasonably to annoy, embarrass or oppress the deponent or party." Ct. Ch. R. 30(d)(3); *see also Hall v. Clifton Precision*, 150 F.R.D. 525, 531–32 (E.D. Pa. 1993) (ruling that "[c]ounsel and their witness-clients shall not engage in private, off-the-record conferences during depositions or during breaks or recesses, except for the purpose of deciding whether to assert a privilege").

[172] *See* Ct. Ch. R. 170(b) ("The admission of an attorney pro hac vice shall not relieve the moving attorney from responsibility to comply with any Rule or order of the Court."); Ct. Ch. R. 170(c)(ii) ("Any attorney seeking admission pro hac vice shall certify the following . . . [t]hat the attorney shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended."); Del. Principles Professionalism for Lawyers A(4) ("A lawyer should represent a client with vigor, dedication and commitment. Such representation, however, does not justify conduct that unnecessarily delays matters, or is abusive, rude or disrespectful. A lawyer should recognize that such conduct may be detrimental to a client's interests and contrary to the administration of justice."). These obligations apply with equal force to lawyers who are permitted to practice in this state under a *pro hac vice* admission. *See* Ct. Ch. R. 170 (c)(ii); *Lendus, LLC v. Goede*, 2018 WL 6498674, at *8 (Del. Ch., Dec. 10, 2018) (holding that revocation of *pro hac vice* admission is an appropriate sanction for "conduct that is repugnant to this Court's ideals of civility and candor"); *State v. Mumford*, 731 A.2d 831, 835–36 (Del. Super. 1999) (holding that an attorney's failure to control witness's offensive behavior during deposition warranted revocation of *pro hac vice* admission).

abusive tactics do a disservice to our busy trial courts, to all involved in the litigation process, and ultimately they impair the truth-seeking function of the discovery process. It is hard to imagine that any reliable factual information could be mined from the Hays deposition fiasco.

Perhaps this episode can be used positively as a lesson to those training new lawyers on deposition skills. Lawyers have an obligation to ensure that their clients do not undermine the integrity of the deposition proceedings by engaging in bad faith litigation tactics; they cannot simply sit and passively observe as their client persists in such conduct. Given the restrictions on conferring with a client during deposition proceedings, these points obviously should be addressed beforehand in the deposition preparation.